665 F.2d 188
 Warren VANSKIKE and Lucille Vanskike, his wife, Appellees,
v.
ACF INDUSTRIES, INCORPORATED f/k/a The American Car and
Foundry Company, a corporation, Appellant.
Union Pacific Railroad Company, a corporation, and St.
Louis-San Francisco Railroad Company, a corporation.
Warren VANSKIKE and Lucille Vanskike, his wife, Appellees,
v.
ACF INDUSTRIES, INCORPORATED f/k/a The American Car and
Foundry Company, a corporation, Union Pacific Railroad
Company, a corporation, Appellant. St. Louis-San Francisco
Railroad Company, a corporation.
Warren VANSKIKE and Lucille Vanskike, his wife, Appellees,
v.
ACF INDUSTRIES, INCORPORATED f/k/a The American Car and
Foundry Company, a corporation, Union Pacific Railroad
Company, a corporation, St. Louis-San Francisco Railroad
Company, a corporation, Appellant.
Warren VANSKIKE, Appellant, Lucille Vanskike,
v.
ACF INDUSTRIES, INCORPORATED f/k/a The American Car and
Foundry Company, a corporation, Appellee. Union Pacific
Railroad Company, a corporation, and St. Louis-San Francisco
Railroad Company, a corporation.
Warren VANSKIKE, Lucille Vanskike, Appellant,
v.
ACF INDUSTRIES, INCORPORATED f/k/a The American Car and
Foundry Company, a corporation, Appellee. Union Pacific
Railroad Company, a corporation, and St. Louis-San Francisco
Railroad Company, a corporation.
 Nos. 80-1717 to 80-1721.
 United States Court of Appeals,
Eighth Circuit.
 Submitted April 15, 1981.
Decided Nov. 9, 1981.
 
 James F. Duncan, argued, William T. Smith, III, A. Mary Sterling, Kansas City, Mo., for appellant Union Pacific Railroad Co.
 John W. Cowden, argued, Karl F. Schmidt, Mark E. Johnson, Theresa L. F. Levings, Morrison, Hecker, Curtis, Kuder & Parrish, Kansas City, Mo., for ACF Industries.
 Glenn A. Burkart, argued, Mann, Walter, Burkart, Weathers & Walter, Springfield, Mo., for appellant St. Louis-San Francisco Railway Co.
 Thomas Strong, Mathew W. Placzek, Strong & Placzek, P.C., Springfield, Mo., for appellees and appellants, Warren Vanskike and Lucille Vanskike; Watson, Ess, Marshall & Enggas, Kansas City, Mo., of counsel.
 Before HEANEY, STEPHENSON and McMILLIAN, Circuit Judges.
 McMILLIAN, Circuit Judge.
 
 
 1
 Defendants ACF Industries, Inc. (ACF), Union Pacific Railroad Co. (Union Pacific) and St. Louis-San Francisco Railway Co. (Frisco) appeal from judgments[1] totalling $904,000 against them in a strict liability case involving a trailer hitch. Plaintiffs Warren and Lucille Vanskike cross-appeal the directed verdict denying as a matter of law their claims for punitive damages. For the reasons discussed below, we affirm the liability findings as to all three defendants, reverse the damages award, and remand the case for a new trial on the damages issue only.
 
 
 2
 This is a products liability case involving a Model A trailer hitch such as that shown in Appendix. The Model A trailer hitch is a mechanical device mounted on a railroad flatcar. Its purpose is to hold in place on a flatcar a highway truck semi-trailer, while the semi-trailer is being transported by the railroad (commonly known as piggyback service). The hitch is in the fully raised position when it is attached to a semi-trailer. It is in the fully lowered position when a semi-trailer is being driven on or off the flatcar or the flatcar is travelling empty.
 
 
 3
 The hitch and flatcar UP Car No. 53805 on which the hitch was mounted were designed and manufactured by ACF, owned by Union Pacific, and in the possession of Frisco at the time of the accident.
 
 
 4
 Warren Vanskike was employed by the Frisco Transportation Co. (Frisco Transportation), a subsidiary of Frisco. Frisco contracted with Frisco Transportation for the services required to load and unload semi-trailers on railroad cars in piggyback service. Warren Vanskike was loading a semi-trailer on a flatcar at the Frisco piggyback yard in Springfield, Missouri, when he was injured.
 
 
 5
 The loading operation being performed by Vanskike and a co-worker at the time of the accident involved the following sequence of events. A truck tractor is used to pull the semi-trailer onto the flatcar. The semi-trailer is placed on the flatcar with the fifth wheel kingpin of the semi-trailer over the hitch. The truck tractor is driven off the flatcar, leaving the front of the semi-trailer supported by its dolly wheels. The fifth wheel kingpin of the semi-trailer is then attached to the trailer mounting plate of the hitch by elevating the hitch and securing the kingpin with the jaws of the trailer mounting plate. In the fully elevated position, the hitch lifts the front end of the semi-trailer off its dolly wheels.
 
 
 6
 The yoke is attached to the bottom of the vertical strut by roller pins. Each roller pin assembly consists of a roller pin, roller, roller bearing, and retaining ring. A roller pin is inserted through the holes in the lower end of each leg of the vertical strut. A roller and roller bearing are assembled on each roller pin within each leg of the vertical strut. The roller pin is then inserted through the hole in the end of the yoke, and the retaining ring is attached to hold the entire assembly in place.
 
 
 7
 Vanskike and his co-worker Louis Tuter were elevating the hitch under a semi-trailer which had been placed on the flatcar. Tuter was facing the left end of the hitch, using an electrically powered wrench to rotate the elevating screw. Vanskike was to his right. The rotation of the elevating screw caused the yoke to move toward Tuter. As the bottom of the vertical strut was drawn towards Tuter by the yoke, the trailer mounting plate rose from a fully lowered to an elevated position. Vanskike was squatting, reaching upward and turning with his hand the screw used to close the mounting plate jaws around the trailer kingpin.
 
 
 8
 The hitch started rising but jammed before the vertical strut was in a fully raised position. Vanskike could see that one of the yoke arms was twisted and had come about halfway off the pin. In an effort to tap the arm back onto the pin, Vanskike reached under the vertical strut and struck the arm with a mechanic's hammer. Both arms came off the pins.[2] The hitch immediately fell to the lowered position. The vertical strut retracted and caught Vanskike's arm between the upper surface of the vertical strut and the lower surface of the diagonal strut. Tuter attempted to elevate the hitch off Vanskike's arm. Although the elevating screw would rotate, the hitch would not elevate because the yoke was no longer connected to the lower end of the vertical strut by the two roller pins. As a result, Vanskike's left arm was crushed and was later amputated between the shoulder and the elbow.
 
 
 9
 The Vanskikes brought a civil action for damages. The initial and amended complaints alleged multiple theories of liability, but at trial all theories were abandoned except strict liability in tort against ACF and Union Pacific and Federal Employers Liability Act (FELA)[3] negligence against Frisco. The claim of defect revolved around ACF's design which used the retaining rings and the railroads' lack of maintenance and inspection which allowed the retaining rings to come off and remain off the roller pins. Cross-claims for contribution by ACF against each of the railroads and by each of the railroads against ACF were also tried.
 
 
 10
 Following a fourteen-day trial, the jury returned a verdict in favor of Warren Vanskike and against all defendants in the sum of $903,000, and a verdict in favor of Lucille Vanskike and against Union Pacific and ACF in the sum of $1,000. On the cross-claims among defendants for apportionment of fault on Warren Vanskike's claims, the jury found ACF to be 30% at fault, Union Pacific to be 30% at fault, and Frisco to be 40% at fault. On the cross-claims between Union Pacific and ACF for apportionment of fault on Lucille Vanskike's claims, the jury found Union Pacific and ACF each 50% at fault. Judgment was entered on the verdict. This appeal followed.
 
 I. SUBMISSIBLE CASE
 
 11
 ACF contends that the Vanskikes failed to make a submissible case against ACF on their strict liability theory.
 
 
 12
 Citing Restatement (Second) of Torts § 402A (1965) (hereinafter Restatement) as consistent with Missouri law on design defects, ACF states that the Vanskikes had to prove the following facts: (1) the hitch was, at the time it was sold, in a defective condition unreasonably dangerous for use by Vanskike; (2) the hitch reached Vanskike without substantial change from the condition in which it was sold; (3) the accident was proximately caused by the alleged design defect; and (4) the hitch was being used at the time of the accident in a manner reasonably anticipated by ACF. Missouri does follow the Restatement. See Blevins v. Cushman Motors, 551 S.W.2d 602, 606 (Mo.1977) (banc); Keener v. Dayton Electric Manufacturing Co., 445 S.W.2d 362, 364 (Mo.1969). Therefore, we will consider those factors in order.
 
 
 13
 First, the duty of care in design should be "consonant with the state of the art." Polk v. Ford Motor Co., 529 F.2d 259, 264 (8th Cir.), cert. denied, 426 U.S. 907, 96 S.Ct. 2229, 48 L.Ed.2d 832 (1976) ("second collision" doctrine), citing Larsen v. General Motors Corp., 391 F.2d 495, 502-03 (8th Cir. 1968). Dr. James Somerset, a professor of mechanical engineering, testified that the hitch was defectively designed so that it would not hold retaining rings at all. In his view, the most significant defect in the hitch was that the yoke was placed outside the legs of the vertical struts. If the yoke had been placed inside, there would have been no problem in restraining the roller pins. If, however, the yoke was to be outside, a better retaining system was required. In the mid-1950's when the hitch was designed[4] there were at least three devices available to keep the pins in place securely, and they cost just a few dollars apiece. At least one such device was in common use as early as 1929. If either method had been used to keep the pins in place, the hitch would not have collapsed. Therefore, the Vanskikes did present evidence that the hitch was in a defective condition at the time it was sold.
 
 
 14
 Second, subsequent changes or alterations in the product do not relieve the manufacturer of strict liability if the changes were foreseeable and the changes did not unforeseeably render the product unsafe. Hales v. Green Colonial, Inc., 490 F.2d 1015, 1020 (8th Cir. 1974). ACF's expert testified that alterations in the hitch, most notably the missing retaining rings, were significant in causing the hitch to collapse. Dr. Somerset did not disagree with that conclusion, but he explained that the alterations were a direct result of the defective design and that the "designer should have known what was going to happen." Therefore, the Vanskikes did present evidence that the subsequent alterations were not such as to relieve ACF from responsibility.
 
 
 15
 Third, proximate cause is related to foreseeability. ACF claims that both failure to inspect by Frisco and misuse by Vanskike were independent intervening causes of the accident. "The retailer's duty to test ... is not a defense to the manufacturer's negligence in constructing the article .... Failure of the vendee to properly inspect and repair is within the foreseeable risk of the manufacturer." Willey v. Fyrogas Co., 363 Mo. 406, 251 S.W.2d 635, 641 (1952) (citations omitted). Similarly, where there are both a design defect and misuse of the product, each of which contribute to an accident, the misuse does not become an intervening cause if the misuse was foreseeable. Griggs v. Firestone Tire & Rubber Co., 513 F.2d 851, 861-62 (8th Cir.), cert. denied, 423 U.S. 865, 96 S.Ct. 124, 46 L.Ed.2d 93 (1975) (negligent failure to warn). According to Dr. Somerset's testimony, the hitch's designers should have foreseen that the hitches would on occasion be operated without retaining rings. That is in fact what happened. The witnesses confirmed that retaining rings were missing from Model A hitches more often than they were present. Vanskike and all the other tie-down men used the hitches when retaining rings were missing. They were not alarmed by missing retaining rings; they had been furnished by Frisco with hammers for the purpose of hitting the hitches if they jammed. Therefore, the Vanskikes did present evidence that any negligence by Frisco and misuse by Vanskike would not have been independent intervening causes but rather products of the design defect.
 
 
 16
 Fourth, the intended use doctrine necessarily includes foreseeable consequences of unintentional misuse. Hoppe v. Midwest Conveyor Co., 485 F.2d 1196, 1201 (8th Cir. 1973), citing Higgins v. Paul Hardeman, Inc., 457 S.W.2d 943 (Mo.App.1970). "The realities of the intended and actual use are well known to the manufacturer and to the public and these realities should be squarely faced by the manufacturer and the court." Polk v. Ford Motor Co., supra, 529 F.2d at 264. Although ACF may have intended that the hitches only be utilized with the retaining rings in place, Dr. Somerset testified that it was inevitable that the retaining rings come off and that the hitches would be operated without retaining rings in place. Therefore, the Vanskikes did present evidence that the hitch was being used in a manner reasonably anticipated by ACF.
 
 
 17
 The Vanskikes introduced testimony and physical evidence in support of each element of a strict liability case. ACF presented its rebuttal but failed to persuade the jury. The evidence was sufficient to support the jury's verdict.
 
 II. NON-SELLER SUPPLIER
 
 18
 Union Pacific, the owner of the flatcar and hitch, contends that it should not be held liable to the Vanskikes under the theory of strict liability in tort. The issue is whether the owner of a railroad car which has passed into the possession and control of another carrier pursuant to the Interchange Rules of the American Association of Railroads (AAR) is a "seller" under § 402A of the Restatement.[5] Union Pacific argues that the AAR Rules are sui generis and that Missouri law bases liability on function rather than mere ownership.
 
 
 19
 The railroad car which injured Vanskike was one of a hundred similar cars purchased by Union Pacific from ACF. These cars, equipped with Model A hitches, were used by Union Pacific in transporting freight on its own line and also were interchanged with other railroads pursuant to the AAR Rules. Each time one of these cars was transferred to another railroad, Union Pacific received compensation from the second railroad for its use. It was through that arrangement that Union Pacific supplied UP Car No. 53805 to Frisco on June 1, 1974. Twenty-six days later, while the car was still in Frisco's possession, its Model A hitch fell and injured Vanskike.
 
 
 20
 In order to promote efficient transportation of goods by rail throughout the United States and Canada, railroads must participate in the open interchange of railroad cars. 45 U.S.C. §§ 82-84; 49 U.S.C. § 1(4), § 15(3). Therefore, in the interests of law and public policy, Union Pacific had to allow Frisco to use its car, and Frisco had to accept the car. Frisco was not required to return the car to Union Pacific within any particular period of time. Frisco was required to pay compensation or give credit according to a schedule set by the Interstate Commerce Commission (ICC). The ICC rate had three components: a mileage charge, a per diem charge, and an incentive charge. 49 C.F.R. § 1036 (1980). The per diem rate was intended to give the owning railroad a fair return on its investment; the incentive charge was later instituted in response to a chronic shortage of cars to spur prompt return of existing cars and to make acquisition of new cars financially attractive to the railroads. See United States v. Florida East Coast Ry., 410 U.S. 224, 23034, 93 S.Ct. 810, 814-815, 35 L.Ed.2d 223 (1973). From June 1 to June 27, Frisco paid or credited Union Pacific for twenty-six days usage and 1,323 miles, but there was no incentive charge.
 
 
 21
 AAR Rule 1 states that each railroad is responsible for the condition of all cars on its lines.
 
 
 22
 It is well established that the duty to discover and remedy defects in railroad cars lies primarily with the operating carrier (, in the present case Frisco). The A.A.R. rules impose a duty on the part of the operating carrier to inspect the interchange cars at every interchange point, and they relieve the originating carrier (here Union Pacific) of all responsibility for the car once the interchange has been effected. (See A.A.R. Rules 1, 89(g)(8).) The applicable regulations of the Interstate Commerce Commission, 49 C.F.R. § 213, et seq., likewise impose the primary inspection obligation on the operating carrier, while the Federal Safety Appliance Act, 45 U.S.C. § 1 (1972), et seq., imposes liability for a defective railroad car solely on the carrier operating the car at the time of the accident.
 
 
 23
 Torres v. Southern Pacific Transportation Co., 584 F.2d 900, 901-02 (9th Cir. 1978) (citations omitted).
 
 
 24
 In Torres v. Southern Pacific Transportation Co., the Ninth Circuit considered the interchange system. First, it held that the plaintiff could not recover from the railroad on a negligence theory because it had fulfilled its duty to inspect under the AAR Rules. Second, it held that the plaintiff could not recover from the railroad on a strict liability theory because Arizona courts had not extended strict liability to lessors. Then, in dicta, it stated:
 
 
 25
 Moreover, it seems clear that even in those jurisdictions which do recognize some lease-relationships as a basis for the application of the doctrine of strict liability, the highly specialized industry-use interchange program to be found in this case is too dissimilar to the commercial distribution of a product to warrant the doctrine's application.
 
 
 26
 Id. at 902.
 
 
 27
 This circuit has reached the opposite conclusion, however, in Parker v. Seaboard Coastline R.R., 573 F.2d 1004 (8th Cir. 1978). Arkansas has a strict liability statute which subjects suppliers of defective products to strict liability.[6] The court treated the interchange program as follows:
 
 
 28
 The record discloses that Seaboard owned the hopper car involved and it was interchanged in interstate commerce and eventually was delivered by the St. Louis-San Francisco Railway Company to the siding of Farm Services, Inc. in Hoxie, Arkansas, where the tragic event occurred.
 
 
 29
 Although the Arkansas statute has been construed with respect to "supplier" and "product," we are satisfied that Seaboard was a supplier and its hopper car a product under the plain meaning of the statute. See generally Legislative Note, 27 Ark.L.Rev. 562 (1973).
 
 
 30
 Id. at 1010-11.
 
 
 31
 As both federal decisions have hinged on state law, we turn next to the strict liability law of Missouri. Missouri has neither a case analyzing the railroad interchange system nor a strict liability statute expanding § 402A of the Restatement, which by its terms covers only "sellers." Missouri has, however, judicially expanded strict liability coverage to include lessors. In Gabbard v. Stephenson's Orchard, Inc., 565 S.W.2d 753 (Mo.App.1978), the plaintiff recovered from the defendant orchard when a three-legged ladder furnished by the orchard collapsed while he was picking fruit. The court held that the orchard was subject to the rule of strict liability as a lessor or bailor of a defective product in the usual course of its business, irrespective of a sale. Although no specific rent was paid for the ladder, the court characterized the ladder as "a part of (the orchard's) profit-oriented operation." Id. at 757. Thus, the doctrine of strict liability was applied to lessors or bailors in commercial transactions. Compare Katz v. Slade, 460 S.W.2d 608 (Mo.1970) (rule not applicable to noncommercial facility).
 
 
 32
 Under Missouri law, therefore, the determinant fact is whether the interchange of railroad cars is a commercial transaction. This is a matter of function rather than mere ownership.
 
 
 33
 Although no railroad is required to purchase or maintain cars, Union Pacific has thousands of cars in the interchange program. UP Car No. 53805, for example, had been interchanged out more than half of the time. Each time UP Car No. 53805 was interchanged out Union Pacific collected a specific rental fee, a per diem which was set so as to give Union Pacific a fair return on its investment plus a mileage charge.[7] There can be little doubt that the interchange program is a part of Union Pacific's profit-oriented operation. Union Pacific is a commercial lessor and therefore subject to strict liability under Missouri law.
 
 III. FELA EMPLOYMENT
 
 34
 Frisco makes several arguments related to its contention that Vanskike was not a statutory employee as defined by the FELA. Vanskike was employed by Frisco Transportation Company, a wholly-owned subsidiary of Frisco. Under the FELA the test of employee status is whether Frisco had control or the right to control Vanskike in the performance of his job. See Porter v. St. Louis-San Francisco Ry., 354 F.2d 840, 843 (5th Cir. 1966). Where the evidence of control is in dispute, the case should go to the jury. Kelley v. Southern Pacific Co., 419 U.S. 318, 331, 95 S.Ct. 472, 479, 42 L.Ed.2d 498 (1974).
 
 
 35
 Frisco concedes the following facts: The piggyback ramp where Vanskike worked as well as the hard hats and tools that he used were owned by Frisco. Frisco employees were responsible for safety conditions. Each morning the Frisco supervisor, Mr. Charles Whitehead, gave Vanskike a list of cars to be loaded and unloaded. The loading and unloading of trailers was a part of the regular business of Frisco. Pursuant to a written contract, Frisco paid Frisco Transportation an hourly rate for the time spent on the ramp by tie-down men, including Vanskike.
 
 
 36
 Frisco considers the following other facts to be countervailing: Vanskike punched a time clock at the Frisco Transportation terminal. He was paid by Frisco Transportation. Mr. Whitehead did not have the authority to discipline or fire Vanskike. Vanskike was a member of the Teamsters Union, rather than a railroad union.
 
 
 37
 Both Vanskike and Frisco agree that the leading case is Kelley v. Southern Pacific Co. In Kelley, an employee of a wholly-owned subsidiary motor carrier sued a railroad under FELA for injuries from falling off a railroad car where he had been working. The railroad owned the yards where the injury occurred. Kelley received workmen's compensation payments from the motor carrier. Although Kelley acknowledged that he was technically employed by the trucking company rather than the railroad, he contended that his work was sufficiently under the control of the railroad to bring him within the FELA. The district court concluded that Kelley was covered on the ground that the motor carrier was an agent of the railroad. The court of appeals reversed because the district court had applied the wrong standard in establishing "employment" for FELA purposes. The Supreme Court vacated and remanded to the district court for findings on whether a master-servant relationship existed between Kelley and the railroad. The test laid down was whether the railroad controlled or had the right to control the subsidiary's employees. 419 U.S. at 322-26, 95 S.Ct. at 475-477. The Court recognized three methods by which a plaintiff could establish "employment" with a railroad for FELA purposes even while nominally employed by another: (1) as a borrowed servant of the railroad, (2) as a servant acting for two masters simultaneously, or (3) as a subservant of a company that was in turn a servant of the railroad. Id. at 324, 95 S.Ct. at 476. On remand, Kelley prevailed under the subservant theory. The salient facts were precisely those present here, namely, the railroad supplied the ramps and working area, was responsible for safety inspections and repairs, and controlled the conduct of the subsidiary's employees. See Hebert v. Southern Pacific Transportation Co., 429 U.S. 904, 97 S.Ct. 270, 50 L.Ed.2d 187 (1976) (dissent from denial of certiorari).
 
 
 38
 Every case cited by Frisco is both pre-Kelley and distinguishable on the issue of actual control. Decisions subsequent to Kelley support our conclusion that the evidence submitted in support of Vanskike's FELA claim against Frisco was more than sufficient to make a submissible case on the issue of control. E. g., Taras v. Baker, 411 F.Supp. 426 (E.D.Pa.1975), aff'd mem., 535 F.2d 1248 (3d Cir. 1976); Williams v. Louisville & National R.R., 398 F.Supp. 683 (S.D.Ohio 1975).
 
 
 39
 There was preponderant evidence that Frisco exercised actual control and supervision over the performance of Vanskike's services. The jury made a finding of fact that Vanskike was an employee of Frisco for FELA purposes.
 
 
 40
 A related contention is that the district court erred in refusing Frisco's offer of proof that it furnished tools at other ramps to independent contractors which were not financially related to Frisco. Frisco argues that such evidence would tend to prove that furnishing tools does not establish an employer-employee relationship.
 
 
 41
 Frisco stipulated that it provided tools and hard hats to Vanskike and other workers at the Springfield piggyback ramp.[8] During the presentation of its case, however, Frisco offered testimony by one of its employees that Frisco also furnished tools to employees of independent contractors at other ramps. The district court rejected the offer of proof stating:
 
 
 42
 I think it would be very confusing and they would have the right to go into all sorts of questions as to whether they had their own supervisor or whether Frisco supervised them and I don't think it has any probative value whatsoever and would only tend to confuse the jury.
 
 
 43
 Such a decision was well within the purview of Fed.R.Evid. 403.
 
 
 44
 Frisco also contends that the district court erroneously admitted the testimony of Vanskike and the other tie-down men concerning their belief as to who was their supervisor. It was undisputed that Whitehead gave them their daily assignment. But Frisco argues that allowing the employees to testify that Whitehead was their "boss" was conclusionary and invaded the province of the jury on the ultimate issue of FELA employment.
 
 
 45
 The belief of an employee as to who is his employer is a fact to be considered in determining whether a master-servant relationship exists. Kelley v. Southern Pacific Co., supra, 419 U.S. at 324-25 & n.5, 95 S.Ct. at 476, citing Restatement (Second) of Agency § 220(2) (1958). There was no error in admitting this testimony.
 
 IV. UNWILLINGNESS TO WORK
 
 46
 All defendants contend that the district court erroneously excluded evidence that Vanskike was not interested in any employment that would pay him less than the disability payments that he would forfeit.[9] Defendants concede, as they must, that collateral source payments are not admissible in mitigation of damages. They argue, however, that they should have been allowed to rebut Vanskike's evidence to the effect that he was highly motivated to return to work.
 
 
 47
 Both Vanskike and his wife testified at depositions that Vanskike had not applied for jobs because, if he went back to work, he would lose his social security and pension payments. They both stated unequivocally that he would not consider any job unless it paid more than his combined disability benefits.
 
 
 48
 Vanskike filed a motion in limine to suppress all evidence concerning the two disability benefits as well as the fact that his acceptance of employment was dependent on the pay exceeding those disability benefits. The district court decided that (1) defendants could not introduce evidence of the collateral source payments because, even if relevant, the probative value would be outweighed by the prejudice which would result and (2) defendants could offer evidence that Vanskike would not accept employment which would pay less than $15,000 per year.
 
 
 49
 As a general rule, evidence of collateral source payments may be admitted for the competent purpose of showing malingering unless the prejudicial impact attending the possibility that the jury will consider it for the purpose of directly reducing recoverable damages is so high, when compared to its probative value for the acceptable purpose, that its admission would be an abuse of discretion. See generally Annot., 47 A.L.R.3d 234 (1973); Fed.R.Evid. 403. A stricter rule is applied, however, in FELA actions. In Eichel v. New York Central R. R., 375 U.S. 253, 255-56, 84 S.Ct. 316, 317, 11 L.Ed.2d 307 (1963) (per curiam), the Supreme Court held that collateral source payments are inadmissible as bearing on the extent or duration of disability in FELA cases.[10] Eichel dealt specifically with Railroad Retirement Act benefits, but this circuit has applied the Eichel rule to other sources. Raycraft v. Duluth, Missabe & Iron Range Ry., 472 F.2d 27, 29 (8th Cir. 1973) (VA disability benefits).
 
 
 50
 Hannah v. Haskins, 612 F.2d 373 (8th Cir. 1980), on which defendants rely, is inapposite for a number of reasons: (1) it is not a FELA case; (2) it recognizes the per se rule in FELA cases, id. at 375; (3) a foundation was laid for impeachment because plaintiff contradicted his deposition testimony; and (4) the decision was governed not by the collateral source doctrine but by the scope of cross-examination.
 
 
 51
 Not only were the collateral source payments inadmissible per se, but also the district court's rulings were correct on the basis of relevancy. In this case, the malingering issue was completely separable from the collateral source issue. Defendants brought out repeatedly and forcefully that Vanskike had not applied for jobs and would not consider a job which paid less than $15,000 per year. This evidence went to the heart of the malingering issue. No additional probative value on that issue would have been derived from revealing his collateral source payments.
 
 IV. INSTRUCTIONS
 A. FELA Employee
 
 52
 Frisco contends that the district court erred in giving Instruction No. 16, which listed thirteen facts which the jury might consider in determining whether Vanskike was a Frisco employee under the FELA. The instruction also directed the jury not to consider by whom Vanskike was paid. Frisco does not argue that the instruction incorrectly stated the law but rather that it was argumentative because it highlighted certain evidence.
 
 
 53
 Instruction No. 16, gives at the instance of Vanskike, read as follows:
 
 
 54
 Even though plaintiff Warren Vanskike was employed by Frisco Transportation Company, he was also an employee of St. Louis-San Francisco Railway Company as that term is used in this instruction if at the time of his injury St. Louis-San Francisco Railway Company controlled or had the right to control the physical conduct of Warren Vanskike.
 
 
 55
 In determining whether St. Louis-San Francisco Railway Company had the right to control the physical conduct of Warren Vanskike, you may consider:
 
 
 56
 One, whether the person who gave Warren Vanskike his work assignments was a St. Louis-San Francisco Railway Company employee;
 
 
 57
 Two, whether Warren Vanskike reported to St. Louis-San Francisco Railway Company when he became sick;
 
 
 58
 Three, whether employees of St. Louis-San Francisco Railway Company determine which hitches would be used;
 
 
 59
 Four, whether Warren Vanskike reported the hitch that would not raise to employees of St. Louis-San Francisco Railway Company;
 
 
 60
 Five, whether the tools and hard hats Warren Vanskike used to perform his work were owned and furnished by St. Louis-San Francisco Railway Company;
 
 
 61
 Six, whether the ramps, building and equipment Warren Vanskike used to perform his job were owned by St. Louis-San Francisco Railway Company;
 
 
 62
 Seven, whether Warren Vanskike performed his job on property owned by the St. Louis-San Francisco Railway Company;
 
 
 63
 Eight, whether Warren Vanskike performed work at the piggyback area on a continual basis rather than on a sporadic basis;
 
 
 64
 Nine, whether loading and unloading trailers on flatcars was a part of the regular business of St. Louis-San Francisco Railway Company;
 
 
 65
 Ten, whether Warren Vanskike had the right to eat his lunch and take his breaks on property owned by the St. Louis-San Francisco Railway Company;
 
 
 66
 Eleven, whether employees of the St. Louis-San Francisco Railway Company, such as claim agents, also performed services for Frisco Transportation without being paid by Frisco Transportation;
 
 
 67
 Twelve, whether Frisco Transportation Company was a wholly-owned subsidiary of St. Louis-San Francisco Railway Company; and
 
 
 68
 Thirteen, whether St. Louis-San Francisco Railway Company paid Frisco Transportation Company by the hour for work Warren Vanskike performed.
 
 
 69
 The fact that Warren Vanskike may have been paid by Frisco Transportation Company does not prevent him from being an employee of St. Louis-San Francisco Railway Company as that term is used in this instruction.
 
 
 70
 Although the instruction did not contain any of the facts that Frisco had argued in derogation of FELA employment, Frisco did not offer any modification, addition or alternate instruction at the charge conference but did object after the charge.
 
 
 71
 An instruction should clarify the issue and inform the jury what factors are probative on that issue. Richardson v. Walsh Construction Co., 334 F.2d 334, 338 (3d Cir. 1964) (joint venture); Stanolind Oil & Gas Co. v. Trosclair, 166 F.2d 229, 231-32 (5th Cir.), cert. denied, 334 U.S. 820, 68 S.Ct. 1086, 92 L.Ed. 1750 (1948) (agency relationship). Instructions must be objective, not phrased in an argumentative vein favorable to either party. A court should go as far as possible to avoid giving undue prominence to a particular theory. Halladay v. Verschoor, 381 F.2d 100, 113 (8th Cir. 1967). An instruction is argumentative if it does not include all the elements of the doctrine, Hortman v. Henderson, 434 F.2d 77, 79 (7th Cir. 1970), or singles out the testimony of one witness while disregarding other relevant evidence, Systems, Inc. v. Bridge Electronics Co., 335 F.2d 465, 467 (3d Cir. 1964), or unduly highlights certain features of a case, Burleson v. Champion, 283 F.2d 653, 655 (5th Cir. 1960). A court must be careful if it intends to tie in principles of law to the facts. Chicago & North Western Ry. v. Rieger, 326 F.2d 329, 336 (8th Cir.), cert. denied, 377 U.S. 917, 84 S.Ct. 1182, 12 L.Ed.2d 186 (1964). Singling out evidentiary features and emphasizing them by special instruction often tends to mislead a jury. Perovich v. United States, 205 U.S. 86, 92, 27 S.Ct. 456, 458, 51 L.Ed. 722 (1907); Northern Central Coal Co. v. Barrowman, 246 F. 906, 910 (8th Cir. 1917); McGirl v. Wiltz, 148 S.W.2d 822, 828 (Mo.App.1941). The court may in its discretion refuse such argumentative instructions. 1 E. Devitt & C. Blackmar, Federal Jury Practice And Instructions § 7.02, at 207 (3d ed. 1977). But giving an argumentative charge is not grounds for reversal unless prejudice results to the complaining party. 75 Am.Jur.2d Trial § 621 (1974).
 
 
 72
 In Ward v. Atlantic Coast Line R.R., 362 U.S. 396, 80 S.Ct. 789, 4 L.Ed.2d 820 (1960) (per curiam), the Supreme Court reversed because the trial court's instruction on FELA employment had incorrectly limited the jury's inquiry to whether the petitioner was aware that the railroad considered him not to be working for it. The Supreme Court approved the petitioner's requested instruction[11] which had stated that the primary factor was the right to control and listed several "other relevant factors." Id. at 398-99, 80 S.Ct. at 791.
 
 
 73
 Both the approved instruction in Ward and the FELA employee instruction in the case at bar began by stating that the issue was right to control. The Ward instruction proceeded to list the other relevant factors in concrete but neutral terms for example: "who selected and engaged the plaintiff to perform the work; who furnished the tools with which the work was performed." 362 U.S. at 398 n.1, 80 S.Ct. at 791; see note 11 supra. In contrast, the instructions here recapitulated plaintiff's evidence in hypothetical form, for example: "One, whether the person who gave Warren Vanskike his work assignments was a St. Louis-San Francisco Railway Company employee; Two, whether Warren Vanskike reported to St. Louis-San Francisco Railway Company when he became sick ...." Furthermore, the Ward instruction included factors which detracted from FELA employment, such as: "who paid the plaintiff his wages for the performance of the work." 362 U.S. at 398 n.1, 80 S.Ct. at 791; see note 11 supra. Here, the instruction singled out and listed only those evidentiary features which favored FELA employment.
 
 
 74
 The instruction was argumentative. But, under the circumstances, it does not require reversal. Unlike the instruction given in Ward, it was not substantively incorrect. More importantly, Frisco cannot affirmatively demonstrate that it was prejudiced. As discussed previously, the evidence of control was overwhelming. Because the instruction would not have changed the result, the error was harmless. Cf. Pitts v. Electro-Static Finishing, Inc., 607 F.2d 799, 804 (8th Cir. 1979) (failure to give "res ipsa" instruction was nonprejudicial where jury found that defendant's negligence was not proximate cause of injury); Lynch v. Travelers Indemnity Co., 452 F.2d 1065, 1067 (8th Cir. 1972) (failure to distinguish between sole cause and efficient cause was unlikely to have changed jury's verdict); County of Todd v. Loegering, 297 F.2d 470, 478-81 (8th Cir. 1961) (refusal of instruction was not reversible error where defendant's unopposed argument to the jury covered matter in refused instruction).
 
 B. Elements of Strict Liability
 
 75
 ACF contends that the district court erred in giving Instruction No. 10 because it incorrectly instructed the jury on the essential elements of strict liability in tort.[12] Specifically, ACF argues that the inclusion of the words "and unforeseeable" in the third paragraph of the instruction was error. ACF also complains that it does not require the jury to test the foreseeability against an objective standard, that is, whether the changes were reasonably foreseeable.
 
 
 76
 Instruction No. 10 was identical to ACF's proffered instruction except for the addition of the words "and unforeseeable" in paragraph three. As given Instruction No. 10 read:
 
 
 77
 Your verdict must be in favor of plaintiff Warren Vanskike and against defendant ACF Industries, Incorporated, if you believe:
 
 
 78
 First, defendant ACF Industries, Incorporated, sold the hitch in the course of its business, and
 
 
 79
 Second, the hitch was then in a defective condition unreasonably dangerous when put to a reasonably anticipated use and
 
 
 80
 Third, the hitch was expected to and did reach plaintiff Warren Vanskike without substantial and unforeseeable changes in the condition in which defendant ACF sold it, and
 
 
 81
 Fourth, the hitch was used in a manner reasonably anticipated, and
 
 
 82
 Fifth, plaintiff Warren Vanskike was damaged as a direct result of such defective condition as existed when the hitch was sold,
 
 
 83
 unless you believe plaintiff Warren Vanskike is not entitled to recover by reason of Instruction No. 11. (emphasis added)
 
 
 84
 ACF relies heavily on Hales v. Green Colonial, Inc., supra, 490 F.2d 1015, a diversity strict liability case arising in Missouri. In Hales the court considered and approved a verdict directing instruction which did not include foreseeability language in the "without substantial change" part of the instruction, even though there was an alteration to the product in question. ACF's reliance is misplaced, however. The instruction in Hales did not contain foreseeability language and was not challenged on that basis. Rather, the defendants had argued that strict liability was not applicable because the product was not "in substantially the same condition" as when sold. This court rejected that argument, stating: "The law recognizes that there can be strict liability of a supplier even though the product is altered or changed if it is foreseeable that the alteration would be made and the change does not unforeseeably render the product unsafe." Id. at 1020.
 
 
 85
 The foreseeability language in the third paragraph of Instruction No. 10 conformed to the substantive law of Missouri as set out in Eighth Circuit decisions. Polk v. Ford Motor Co., supra, 529 F.2d at 268-70; Hales v. Green Colonial, Inc., supra, 490 F.2d at 1020-21; Hoppe v. Midwest Conveyor Co., supra, 485 F.2d at 1200-01. There was no error in the inclusion of the words "and unforeseeable."
 
 C. Contributory Fault
 
 86
 ACF contends that the district court erred in giving Instruction No. 11 because it incorrectly stated the law of Missouri on the defense of contributory fault in a strict liability action.[13] ACF argues that the instruction incorrectly required the jury to find that Vanskike knew of the design defect in order to find him contributorily at fault.
 
 
 87
 The district court, over the objection of ACF, gave the following Instruction No. 11:
 
 
 88
 Your verdict must be for the defendant ACF Industries, Incorporated on the claim of Warren Vanskike for personal injuries if you believe:
 
 
 89
 First, when the hitch was used, plaintiff Warren Vanskike knew of the danger as submitted in Instruction No. 10 and appreciated the danger of its use, and
 
 
 90
 Second, he voluntarily and unreasonably exposed himself to such danger, and
 
 
 91
 Third, such conduct directly caused or directly contributed to cause any damage he may have sustained. (emphasis added)
 
 
 92
 Instruction No. 11 correctly set out the substantive law of Missouri on contributory fault. This instruction tracked the applicable Missouri Approved Instruction, MAI 32.23. "(F)ederal courts are not required to give the precise instructions set out in MAI. This does not detract from their usefulness to the trial judge, but there exists no strict rule which requires literal use as apparently required in state cases by the Missouri Supreme Court." Scott v. Conroy, 577 F.2d 13, 16 n.2 (8th Cir. 1978), citing Brown v. St. Louis Public Service Co., 421 S.W.2d 255 (Mo.1967) (banc); see also Mo.Sup.Ct.R. 70.02(b).
 
 
 93
 Furthermore, as Collins v. B. F. Goodrich Co., 558 F.2d 908, 911-12 (8th Cir. 1977), clarifies, the "danger" which the plaintiff must know is not the design defect per se but the risk to the user. The second paragraph of Instruction No. 10 required the jury to find that the condition of the hitch was both "defective" and "unreasonably dangerous when put to a reasonably anticipated use." The danger was not the design defect but the fact that the hitch might fall. Notwithstanding his ignorance of the design defect, if Vanskike had known that the hitch could fall on him when he tapped it with a hammer and had done so anyway, he would have been contributorily at fault. Instruction No. 11 correctly instructed the jury that Vanskike must have known of the danger.
 
 D. AAR Rules
 
 94
 ACF contends that the district court erred in giving Instruction No. 8 because it incorrectly withdrew evidence about the AAR Rules from consideration by the jury in connection with Vanskike's claims against ACF.
 
 
 95
 There was testimony that ACF was aware of the AAR Rules pertaining to inspection and repair of trailer hitches. ACF knew that railroads maintained their own mechanical departments and took responsibility for repair or replacement of equipment parts. Therefore, ACF argues, it could have reasonably anticipated that the Model A hitch would not be used with worn out, broken, bent or missing parts, and without correct repairs, maintenance and welding. If so, the AAR Rules would have been relevant on the issues of (1) whether the hitch was unreasonably dangerous when put to a reasonably anticipated use, (2) whether the hitch was used in a manner reasonably anticipated by ACF, and (3) whether the alleged defective design of the hitch proximately caused the accident. In fact, ACF did argue the above issues to the jury.
 
 
 96
 The district court, over ACF's objection, gave the following Instruction No. 8: "The Association of American Railroads Rules mentioned in the evidence do not limit in any degree the responsibility of any defendant to either plaintiff."
 
 
 97
 Vanskike, who submitted Instruction No. 8, says that the instruction was not intended to do anything more than inform the jury that ACF had a non-delegable duty to the user. Vanskike agreed at trial that the AAR Rules were probative on apportionment of fault.
 
 
 98
 Missouri holds that a manufacturer has a non-delegable duty to design and manufacture a safe product. See Willey v. Fyrogas Co., supra, 251 S.W.2d at 641. See also De Santis v. Parker Feeders, Inc., 547 F.2d 357 (7th Cir. 1976) (applying Wisconsin law); Christopherson v. Hyster Co., 58 Ill.App.3d 791, 16 Ill.Dec. 83, 734 N.E.2d 858, 872-73 (1978). It was not error to give Instruction No. 8.
 
 E. ACF Cross-claims
 
 99
 ACF contends that the district court erroneously refused to give verdict directing instructions on ACF's cross-claims against Union Pacific and Frisco. ACF argues that it was denied its right to have the jury instructed on its theory of the case.
 
 
 100
 ACF's proffered instruction on its cross-claim against Union Pacific would have instructed the jury as follows:
 
 
 101
 If your verdict is in favor of plaintiff Warren Vanskike and against defendant ACF, then your verdict must also be for defendant ACF on its claim seeking an apportionment of fault against defendant Union Pacific if you believe:
 
 First, defendant Union Pacific either:
 
 102
 (a) failed to detect by inspection that parts of the hitch were missing, broken, bent, or worn out while the hitch was in its possession before June 1, 1974, or
 
 
 103
 (b) failed to make proper repairs to the hitch while the hitch was in its possession before June 1, 1974, and
 
 
 104
 Second, defendant Union Pacific in any one or more of the respects submitted in Paragraph First, was thereby negligent, and
 
 
 105
 Third, as a direct result of such negligence, plaintiff Warren Vanskike sustained damage.
 
 
 106
 ACF's proffered instruction on its cross-claim against Frisco would have instructed the jury as follows:
 
 
 107
 If your verdict is in favor of plaintiff Warren Vanskike and against defendant ACF, then your verdict must also be for defendant ACF on its claim seeking an apportionment of fault against defendant Frisco Railroad if you believe:
 
 First, defendant Frisco Railroad either
 
 108
 (a) failed to detect by inspection that parts of the hitch were missing, broken, bent or worn out after the hitch came into its possession and before plaintiff Warren Vanskike attempted to use it, or
 
 
 109
 (b) failed to make proper repairs to the hitch after the hitch came into its possession and before plaintiff Warren Vanskike attempted to use it, or
 
 
 110
 (c) failed to properly instruct its employees concerning the use of hitches, including the hitch involved in the accident, and
 
 
 111
 Second, defendant Frisco Railroad, in any one or more of the respects submitted in Paragraph First, was thereby negligent, and
 
 
 112
 Third, as a direct result of such negligence, plaintiff Warren Vanskike sustained damage.
 
 
 113
 Each party is entitled to have the jury instructed on its theory of the case if there is any competent evidence to support it and it is properly requested. Bartak v. Bell-Galyardt & Wells, Inc., 629 F.2d 523, 528 (8th Cir. 1980); see also Moore v. Parks, 458 S.W.2d 344, 349 (Mo.1970). This is so even if the theory is controverted by some evidence of the opposing party. Bartak v. Bell-Galyardt & Wells, Inc., supra, 629 F.2d at 528. A cross-claimant or third-party plaintiff has the right to submit its own theory of the case to the jury even if it differs from the plaintiff's theories. See Potter v. St. Louis-San Francisco Ry., 622 F.2d 979, 983-84 (8th Cir. 1980) (counterclaim); see also Missouri Pacific R.R. v. Whitehead & Kales Co., 566 S.W.2d 466 (Mo.1978) (banc).
 
 
 114
 (W)hile a litigant is entitled to have the trial judge advise the jury of his theories and claims (to the extent they are supported by the evidence adduced at trial), the actual form of the instructions is within the trial court's discretion. Counsel cannot, therefore, require that an instruction be rendered in the categorical language that he fancies would be most beneficial to his cause
 
 
 115
 Reyes v. Wyeth Laboratories, 498 F.2d 1264, 1289 (5th Cir.) (footnote omitted), cert. denied, 419 U.S. 1096, 95 S.Ct. 687, 42 L.Ed.2d 688 (1974). The district court is only required to instruct on all elements of the case in light of controlling state law. Scott v. Conroy, supra, 577 F.2d at 16 n.2. When a portion of a jury instruction is assigned as error, therefore, the reviewing court must look to the instruction as a whole. Fields v. Chicago Rock Island & Pacific R.R., 532 F.2d 1211, 1213-14 (8th Cir. 1976).
 
 
 116
 Taken as a whole, the instructions given by the district court correctly instructed the jury on substantive state law as well as ACF's theory of the case. One instruction stated that the verdict must be against Frisco if Frisco was negligent and its negligence resulted in Vanskike's injury. Another instruction stated that the verdict must be against Union Pacific if the hitch was in a defective condition when rented and such defective condition resulted in Vanskike's injury. Finally, instructions were given on the claims between the defendants for assessment of the proportions of fault. The jury was instructed that the fault must be apportioned among or between the defendants against whom a verdict was returned, that the percentage for each liable defendant must be more than zero, and that the total percentages must equal 100 percent.
 
 
 117
 ACF sought apportionment of fault. Not only was the jury instructed on apportionment of fault but in fact the jury did apportion the fault among all three defendants. ACF cannot now complain that the apportionment instruction was not given in precisely the form that it would have chosen. The district court was under no obligation to use the language requested by ACF where the instructions as a whole correctly instructed the jury. The trial court did not abuse its discretion in refusing to give ACF's proffered instructions.
 
 F. Taxation of Damages
 
 118
 ACF and Union Pacific contend that the trial court erred in refusing to give ACF's pretrial[14] proposed jury instruction on the nontaxability of a jury award. ACF argues that the jury increased the award because of its mistaken belief that a verdict for either plaintiff would be subject to income taxes.
 
 
 119
 Defendants rely on Norfolk & Western Ry. v. Liepelt, 444 U.S. 490, 100 S.Ct. 755, 62 L.Ed.2d 689 (1980), where the Supreme Court held that, in an action under the FELA,[15] it was prejudicial error to refuse to instruct the jury that an award would not be subject to income tax. Id. at 498, 100 S.Ct. at 759.
 
 
 120
 In Flanigan v. Burlington Northern, Inc., 632 F.2d 880 (8th Cir. 1980), cert. denied, 450 U.S. 921, 101 S.Ct. 1370, 67 L.Ed.2d 349 (1981), we held that Liepelt should be applied retroactively but that failure to instruct on nontaxability is harmless error unless the defendant establishes the prejudicial effect of the trial court's refusal to give a requested instruction. Id. at 889. The question is whether the defendant can show that the jury was operating under a false impression of the tax law. Id. at 890, citing Raycraft v. Duluth, Missabe & Iron Range Ry., supra, 472 F.2d at 33 n.10. A great disparity between the evidence and the verdict would be one indication that the jury did operate under such a false impression. 632 F.2d at 890, citing Norfolk & Western Ry. v. Liepelt, supra, 444 U.S. at 497, 100 S.Ct. at 759.
 
 
 121
 There was testimony that Vanskike's past lost wages were $108,654 and his future lost wages were $583,291. He was also entitled to be compensated for his medical expenses and for pain and suffering. There is not such a great disparity between the evidence and the award as to indicate that the jury increased the award because of a mistaken belief that the verdict would be subject to income taxes. Compare Norfolk & Western Ry. v. Liepelt, supra, 444 U.S. at 497, 100 S.Ct. at 759 (award was over two and one-half times the amount supported by the evidence). Therefore, the refusal to give a nontaxability instruction would not require reversal in the present case. However, because we reverse and remand the damages issue for a new trial on another ground, see Part VII B infra, the district court, if so requested, should give a nontaxability instruction on remand.
 
 VI. JUROR CHALLENGES
 
 122
 Frisco contends that the district court erred in sustaining Vanskike's challenges of veniremen Sims and Dill for cause because neither had, during voir dire, demonstrated bias or prejudice against plaintiffs or in favor of defendants. Frisco maintains that the effect of the district court's sustaining such challenges was to give plaintiffs more than three peremptory challenges in violation of 28 U.S.C. § 1870.
 
 
 123
 Sims was challenged because he and his corporate employer had previously been sued in an accident case. Dill was challenged because he had served on a jury in a wrongful death action against a corporate defendant. Their previous experiences were cited as possible influences on their reactions to this case.
 
 
 124
 This contention fails. Frisco did not object to the discharge of the three jurors and so failed to preserve the issue for review. Further, the district court has wide discretion in ruling on challenges for cause and will be reversed only if there is a manifest abuse of such discretion. Hathorn v. Trine, 592 F.2d 463, 465 (8th Cir. 1979) (per curiam). Here, after a lengthy voir dire during which the district court observed the jurors and evaluated their answers, the district court listened to the specific objections of Vanskike's attorney to these two jurors and sustained them. There was no abuse of discretion. See also United States v. Calhoun, 542 F.2d 1094, 1103 (9th Cir. 1976) (not reversible error to excuse juror without sufficient cause if jury was impartial), cert. denied, 429 U.S. 1064, 97 S.Ct. 792, 50 L.Ed.2d 781 (1977).
 
 VII. DAMAGES ISSUES
 A. Punitive Damages
 
 125
 Warren and Lucille Vanskike cross-appeal, contending that the district court erred in granting ACF's motion for a directed verdict on their punitive damages claims against ACF and Union Pacific. The Vanskikes requested a new trial solely on the issue of punitive damages against ACF.
 
 
 126
 ACF urges that Missouri law on punitive damages does not extend to a strict liability case based on a design defect.[16] Although some jurisdictions do allow punitive damages in a strict liability case,[17] our research indicates that Missouri courts have not yet ruled on that issue.[18]
 
 
 127
 We need not attempt to divine how the Missouri courts will rule on this issue because the evidence admitted at trial combined with the offered evidence which the district court refused to admit[19] still would have been insufficient as a matter of law under Missouri substantive law to submit the issue of punitive damages to the jury. "(A)cts justifying imposition of punitive damages must be willful, wanton, malicious or so reckless as to be in utter disregard of consequences. There must be some element of wantonness or bad motive." McClellan v. Highland Sales & Investment Co., 484 S.W.2d 239, 242 (Mo.1972) (citation omitted). In the present case there was no evidence, admitted or offered, of any acts by ACF that were willful, wanton, malicious or so reckless as to be in utter disregard of the safety of others, nor was there any showing of bad motive.
 
 B. Punitive Damages Closing Argument
 
 128
 ACF contends that the district court erred in overruling ACF's motion for a mistrial because Vanskike's counsel improperly made a punitive damages closing argument. ACF argues that the argument was inflammatory and resulted in an excessive verdict. ACF requests a new trial on the issues of both liability and damages.
 
 
 129
 In his opening argument, Vanskike's counsel told the jury that he was seeking punitive damages against ACF. But at the close of Vanskike's evidence on the issue of punitive damages, the district court granted ACF's motion for a directed verdict on this issue because Vanskike had not made a submissible case. Despite that ruling, Vanskike's Counsel made the following statement in his closing argument:
 
 
 130
 I, in the past several months, have prayed many times that I would have the wisdom and somehow the ability to present this case to you and I pray that you somehow would have the courage to fulfill your responsibilities because this is an extremely, extremely important case. There are few cases over a period of time that have far-reaching impacts. One jury, as the conscience of the American public, told Ford Motor Company that they had misdesigned a gas tank on a Pinto. Here in this case, you as the conscience of the American public, will tell two railroad companies what kind of equipment they should furnish to people who are going to work around their equipment. And you, as the conscience of the American public, will tell an industry, ACF, what it must do in the design of a new product.
 
 
 131
 Finally, perhaps most important, you will express your opinion on the value of a destroyed life.
 
 
 132
 There was no objection at that time. Then ACF's counsel, in his closing argument, said, "Jack Best, from the Union Pacific, to his knowledge, had had no other claims for injuries concerning the Model A hitch."
 
 
 133
 Ostensibly in response to that, Vanskike's counsel argued:
 
 
 134
 And you know how many railroad companies there are in the United States? I checked with the library, 663. If every railroad company in the United States had a person maimed by a Model A hitch, we would have 663 ruined lives. They seem proud of the fact that they just destroyed one life with these 200 hitches plus the others that come through. I say it's a sorry commentary on them. And I say we ought to make sure that this is the last one.
 
 
 135
 ACF moved for a mistrial at the completion of the responsive argument on the ground that the reference to the Pinto case, see Grimshaw v. Ford Motor Co., 119 Cal.App.3d 757, 174 Cal.Rptr. 348 (1981), was an improper punitive damages argument. The district court denied the motion.
 
 
 136
 The Ford Pinto case in California had received extensive press and television coverage throughout the United States shortly before the Vanskike trial. The jury in Grimshaw had awarded approximately $125,000,000 in punitive damages against Ford. Vanskike, however, characterizes his counsel's statements as mere reminders that jury verdicts-whether punitive or compensatory-affect behavior.
 
 
 137
 Argument of counsel is a procedural question to be determined by federal law. Illinois Central R.R. v. Staples, 272 F.2d 829, 834 (8th Cir. 1959). The district court is in a better position to determine whether prejudice has resulted from a closing argument, and the appellate court will not disturb the district court's ruling unless there has been an abuse of discretion. McDonald v. United Airlines, Inc., 365 F.2d 593 (10th Cir. 1966); Smith v. Courter, 531 S.W.2d 743, 746-47 (Mo.1976) (banc).
 
 
 138
 Nevertheless, juries cannot be told directly or in effect that they may consider punishment or deterrence as an element of damages and include a sum of money in their verdict so as to punish the defendant or deter others from like conduct unless the pleadings, evidence and instructions warrant the separate submission of punitive damages under the law. To do otherwise, would eliminate the distinction between compensatory and punitive damages, a distinction long part of the law of this state, and would cloud every verdict to a point where the court could not know whether the compensatory damage verdict did or did not include a punitive sum.
 
 
 139
 Of course, a court cannot now know the mind of each juror as he goes about the task of deciding upon the amount of the verdict, and jurors cannot be heard to impeach their own verdicts. So it becomes of importance that jurors not be told they can include as part of their award an element of damages that the law does not allow. Therefore, they should not be motivated by argument to hold as one of their objectives, in arriving at the amount of their verdict, the punishment of the defendant or the deterrence of others.
 
 
 140
 Smith v. Courter, supra, 531 S.W.2d at 748.
 
 
 141
 As discussed previously, the evidence did not warrant the submission of punitive damages. Yet there can be little doubt that Vanskike's closing argument invited the jury both to punish ACF and to deter others from like conduct. It was highly improper for counsel to suggest to this jury that it should follow the California Pinto case and award punitive damages. We agree with ACF that such an inflammatory argument resulted in an excessive award. Therefore, the district court abused its discretion, to the prejudice of ACF, in overruling ACF's motion for mistrial. Because we believe that the liability and damages issues are sufficiently separable in the present case, we reverse and remand for a new trial on the damages issue only as to all three defendants.
 
 C. Per Diem Damages Argument
 
 142
 ACF and Union Pacific contend that the district court erred in failing to declare a mistrial because of the Vanskikes' unit-of-time, or per diem, damages argument. The Vanskikes counter that permitting the argument was within the discretion of the district court or, alternatively, that the defendants were not prejudiced by the argument.
 
 
 143
 In their closing argument to the jury, the Vanskikes urged the jury to adopt unit-of-time valuations and mathematical computations utilizing such measurements to compute damages for pain and suffering. They first asked the jury to award $1,000 to Warren Vanskike for his pain and suffering on the day of his injury. The jury was then asked to award $2,700 for 27 days of hospitalization at $100 per day. Finally, an award for future pain and suffering of $402,712 was calculated by multiplying a per hour valuation of $1.50 ($36 per diem) by the 11,242 days of Warren Vanskike's anticipated life expectancy. They also asked the jury for $202,788 for Lucille's "debt" based upon 75 cents per hour ($18 per diem) times the 11,266 days of her anticipated life expectancy. These per hour and per diem valuations and calculations were displayed on a large chart placed before the jury during closing argument.
 
 
 144
 Defendants' motions for a mistrial were denied, but the district court stated, "The Eighth Circuit is going to reverse you if you get a verdict."
 
 
 145
 The propriety of closing argument is a procedural issue to be determined by federal law. McDonald v. United Airlines, Inc., supra, 365 F.2d at 595; Yeargain v. National Dairy Products Corp., 317 F.2d 779, 780 (8th Cir. 1963). "Although there is a sharp split among the state authorities on the use of the so-called 'unit-of-time' argument, the federal courts of appeal which have considered the question generally have permitted such arguments." Waldron v. Hardwick, 406 F.2d 86, 89 (7th Cir. 1969) (footnotes omitted). Missouri is a state which opposes the per diem argument. See Strong, Per Diem Argument in Missouri-A Status Report, 35 J.Mo.Bar 237 (1979). Likewise, although this circuit has never expressly considered the propriety of per diem closing arguments, ever since Chicago & North Western Ry. v. Candler, 283 F. 881 (8th Cir. 1922), we have upheld the refusal to give instructions requiring per diem mathematical calculation of future pain and suffering. Cf. Flanigan v. Burlington Northern, Inc., supra, 632 F.2d at 886-87 (improper to reduce an award for pain and suffering to present value); but cf. Chiarello v. Domenico Bus Service, Inc., 542 F.2d 883, 886 (2d Cir. 1976) (damages for future pain and suffering should be reduced to present value). This condemnation has been interpreted by other circuits as a prohibition on unit-of-time arguments. See, e. g., Waldron v. Hardwick, supra, 406 F.2d at 89 n.4; Baron Tube Co. v. Transport Insurance Co., 365 F.2d 858, 863 n.3 (5th Cir. 1966). Some circuits allow unit-of-time arguments only so long as they are carefully controlled by the district court, id., and do not result in excessive verdicts. Waldron v. Hardwick, supra, 406 F.2d 86; Pennsylvania R.R. v. McKinley, 288 F.2d 262 (6th Cir. 1961).
 
 
 146
 We recognize that limitation of counsel's argument to the jury on computation of damages is within the discretion of the district judge. Therefore, although we continue to condemn instructions requiring per diem mathematical calculations, we do not disapprove of per diem closing arguments as long as such arguments are carefully controlled by the district court. See Waldron v. Hardwick, supra, 406 F.2d at 89 (declining to adopt an inflexible rule of prohibition). Our position continues to be, however, that unit-of-time calculations are arbitrary and artificial. As stated in Flanigan v. Burlington Northern, Inc., supra, 632 F.2d at 886:
 
 
 147
 The same amount of pain and suffering does not occur from year to year nor can the degree of pain and suffering that will occur in any year be quantified with any degree of certainty. Requiring the reduction of an award for pain and suffering to its present value would improperly allow a jury to infer that pain and suffering can be reduced to a precise arithmetic calculation.
 
 
 148
 Because we have reversed and remanded the damages issue for a new trial on another ground, see Part VII B supra, on remand the district court should take steps to insure fairness in the per diem argument. The jury should be cautioned that references to per diem damages in closing arguments are not evidence, but merely a form of argument, and that pain and suffering cannot be reduced to a precise arithmetic calculation. See Flanigan v. Burlington Northern, Inc., supra, 632 F.2d at 886; Waldron v. Hardwick, supra, 406 F.2d at 89.
 
 D. Future Income
 
 149
 All three defendants contend that the district court erred in admitting the evidence of Vanskike's economist witness, Larry Cox, concerning Vanskike's future lost income. They argue that this testimony lacked proper foundation and was based on pure speculation and conjecture. Specifically, they complain that (1) the witness used an assumed 3.9% annual "productivity increase" based on a review of Teamsters Union bargaining agreements to project future lost wages, (2) the witness used gross wages rather than net wages, (3) the use of a 2.5% present value discount factor included the assumption that inflation would continue, and (4) the witness made assumptions about Vanskike's work-life expectancy, overtime opportunities, and household tasks, without allowing for strikes or sick leave. Defendants did not call an economist as an expert witness or make any offers of proof but did cross-examine plaintiffs' witness for nearly a day.
 
 
 150
 The short answer to this contention is that the testimony presented here was within the guidelines set forth in Taenzler v. Burlington Northern, Inc., 608 F.2d 796, 798-802 (8th Cir. 1979). See Norfolk & Western Ry. v. Liepelt, supra, 444 U.S. at 494-95, 100 S.Ct. at 757-758. Assumptions such as those the economist made go to the weight of the evidence and not its admissibility. Taenzler v. Burlington Northern, Inc., supra, 608 F.2d at 798 n.3. There was no error in this regard.
 
 VIII. Disposition
 
 151
 The liability issue is affirmed as to all three defendants. However, we reverse and remand for a new trial on the damages issue as to all three defendants because of the inflammatory reference in closing argument to punitive damages and the California Pinto case. On remand the district court should instruct the jury, if so requested, that any award would not be subject to income tax and should caution the jury about any references to per diem calculations of damages in closing argument.
 
 
 152
 Accordingly, the judgment of the district court is affirmed in part, reversed in part, and remanded for a new trial on the damages issue only.
 
 APPENDIX
 
 153
 NOTE: OPINION CONTAINS TABLE OR OTHER DATA THAT IS NOT VIEWABLE
 
 
 
 [1]
 The Honorable William R. Collinson, United States Senior District Judge for the Western District of Missouri
 
 
 [2]
 If only one arm had come off a pin, the hitch would not have dropped (Tr. 1782)
 
 
 [3]
 45 U.S.C. § 51 et seq
 
 
 [4]
 The ACF Model A was the first trailer hitch designed or manufactured by any manufacturer. It was also the only hitch ever manufactured with retaining rings. After number 1207 of the Model A, ACF changed the design of its retainer ring system. Later models of ACF hitches did not use retainer rings at all
 
 
 [5]
 Restatement (Second) of Torts § 402A (1965) provides:
 (1) One who sells any product in a defective condition unreasonably dangerous to the user or consumer or to his property is subject to liability for physical harm thereby caused to the ultimate user or consumer, or to his property, if
 (a) the seller is engaged in the business of selling such a product, and
 (b) it is expected to and does reach the user or consumer without substantial change in the condition in which it is sold.
 (2) The rule stated in Subsection (1) applies although
 (a) The seller has exercised all possible care in the preparation and sale of his product, and
 (b) the user or consumer has not bought the product from or entered into any contractual relation with the seller.
 
 
 [6]
 Ark.Stat.Ann. § 85-2-318.2 (Supp.1975) provides:
 Liability of supplier-Conditions.-A supplier of a product is subject to liability in damages for harm to a person or to property if:
 (a) the supplier is engaged in the business of manufacturing, assembling, selling, leasing or otherwise distributing such product;
 (b) the product was supplied by him in a defective condition which rendered it unreasonably dangerous; and
 (c) the defective condition was a proximate cause of the harm to person or to property.
 
 
 [7]
 As there was no incentive fee here, we need not consider whether that too was a rental fee
 
 
 [8]
 Instruction 16 listed the furnishing of tools as one fact which the jury might consider on the issue of employment under the FELA. See discussion in text Pt. V A infra
 
 
 [9]
 Frisco also argues that the district court erred in refusing its offer of proof that Vanskike had been paid workmen's compensation benefits by Frisco Transportation because (a) it was an admission against interest and (b) it estopped him from asserting that Frisco was his employer. The district court based its refusal on the collateral source doctrine. First, mere receipt of compensation benefits from one party does not preclude suit against another party. Safeco Ins. Co. v. Broadnax, 601 S.W.2d 466, 468 (Tex.Civ.App.1980). Second, payment of benefits by Frisco Transportation was not necessarily inconsistent with the subservant concept discussed in Kelley v. Southern Pac. Co., 419 U.S. 318, 95 S.Ct. 472, 42 L.Ed.2d 498 (1974)
 
 
 [10]
 Although Eichel was a pre-Federal Rules of Evidence case, this conclusion is bolstered by Fed.R.Evid. 403
 
 
 [11]
 One of the issues to be decided in this case is whether or not the plaintiff, Raymond P. Ward, was employed by the defendant railroad at the time he was injured. This issue must be determined from all the circumstances of the case. The primary factor to be considered is whether or not the railroad had the power to direct, control, and supervise the plaintiff in the performance of his work at the time he was injured. Other relevant factors to be considered are: who selected and engaged the plaintiff to perform the work; who furnished the tools with which the work was performed; who paid the plaintiff his wages for the performance of the work; the amount of scale of such wages; and who had the power to fire or dismiss the plaintiff from the work
 If you find that the railroad, through its foreman, I. H. Keen, had the power to direct, control and supervise the plaintiff in the performance of the work he was doing at the time he was injured, then you should find that the plaintiff was employed by the defendant railroad at the time he was injured.
 The fact that the money used to pay the plaintiff Ward for the work he was doing at the time he was injured came originally from some third person with whom the railroad or the owner of the spur track had made an arrangement, does not remove the defendant railroad from its employer-employee relationship with the plaintiff Ward and does not relieve the defendant railroad of liability for injuries suffered by the plaintiff during the course of his railroad employment as a result of the defendant railroad's negligence.
 The accident here involved occurred upon a spur track which was partly owned by the M. & M. Turpentine Co. The fact that the M. & M. Turpentine Co. had contracted with the defendant railroad to maintain all or a portion of this spur track does not relieve the defendant railroad of its liability to the plaintiff if the plaintiff was injured during the course of his employment with the defendant railroad on the spur track as a direct consequence, in whole or in part, of the defendant railroad's negligence.
 Ward v. Atlantic Coast Line R.R., 362 U.S. 396, 398-99 n.1, 80 S.Ct. 789, 791, 4 L.Ed.2d 820 (1960) (per curiam).
 
 
 [12]
 Instruction No. 22, Lucille Vanskike's verdict director against ACF, has the same language
 
 
 [13]
 Instruction No. 23 is identical to Instruction No. 11, except that it relates to Lucille Vanskike's claim
 
 
 [14]
 This instruction was not offered by any defendant at the instruction conference. ACF also asks this court to consider this issue under the plain error rule
 
 
 [15]
 Frisco, the FELA defendant, does not raise this point, but the strict liability defendants contend that it applies to all defendants where FELA and state claims are combined in the same trial
 
 
 [16]
 Alternatively, the Vanskikes argue that their amended complaint put ACF on notice of a claim for punitive damages based on negligent failure to warn. When they voluntarily dismissed their negligent failure to warn count however, the parties as well as the district judge reached a clear understanding that the negligent failure to warn issue was out of the case
 Arguably, the amended complaint raised a strict liability failure to warn theory. But that would not affect our result.
 
 
 [17]
 Strict liability evolved as a way of allocating risk where there had been no fault on either side but the defendant was better able to bear the loss. W. Prosser, Law of Torts 494 (4th ed. 1971). Commentators are divided over whether punitive damages should be allowed in actions brought on a strict liability theory. Some find them inconsistent because strict liability is not based on the manufacturer's fault but rather on a defect in the product, while punitive damages requires allegations of aggravated fault. See, e. g., Haskell, The Aircraft Manufacturer's Liability for Design and Punitive Damages-The Insurance Policy and Public Policy, 40 J.Air L. & Com. 595 (1974); Tozer, Punitive Damages and Products Liability, 39 Ins.Counsel J. 300 (1972). More recently, others reason, "As a liability doctrine designed to compensate product accident victims for their actual losses, strict tort liability has never purported to delimit the remedies that might be appropriate if a plaintiff's accident is attributable to some aggravated fault of the manufacturer." Owen, Punitive Damages in Products Liability Litigation, 74 Mich.L.Rev. 1258, 1269 (1976). Likewise, state courts are split on this issue. The following cases have allowed the plaintiff to combine a strict liability count with one for punitive damages: D'Hedouville v. Pioneer Hotel Co., 552 F.2d 886 (9th Cir. 1977) (applying Arizona law); Johnson v. Husky Ind., Inc., 536 F.2d 645 (6th Cir. 1976) (applying Tennessee law); Simmons v. Atlas Vac Mach. Co., 475 F.Supp. 1181 (E.D.Wis.1979); Maxey v. Freightliner Corp., 450 F.Supp. 955 (N.D.Tex.1978), aff'd, 623 F.2d 395, rehearing granted, 634 F.2d 1008 (5th Cir. 1980); Thomas v. American Cytoscope Makers, Inc., 414 F.Supp. 255 (E.D.Pa.1976); Sturm, Ruger & Co. v. Day, 594 P.2d 38 (Alaska 1979), modified, 615 P.2d 621 (1980); Heil Co. v. Grant, 534 S.W.2d 916 (Tex.Civ.App.1976); Wangen v. Ford Motor Co., 97 Wis.2d 260, 294 N.W.2d 437 (1980)
 
 
 [18]
 In Rinker v. Ford Motor Co., 567 S.W.2d 655 (Mo.App.1978), the plaintiff's claim based on strict liability was submitted by separate instructions against the manufacturer and the dealer. Another instruction submitted a claim against the manufacturer based upon negligent failure to warn. A punitive damages instruction submitted such claim against the manufacturer in the event of a finding against that defendant on the negligent failure to warn theory. The verdict was in favor of the dealer and was against the manufacturer on only one theory of liability-negligent failure to warn. The Missouri Court of Appeals upheld that punitive damages award, holding that punitive damages were allowable in products liability cases so long as there was evidence of indifference to or conscious disregard for the safety of others "equivalent to intentional wrongdoing." Id. at 668, citing Reel v. Consolidated Inv. Co., 236 S.W. 43 (Mo.1921)
 Rinker is not, however, authority for the allowance of punitive damages in a claim based on strict liability. That trial court instructed on punitive damages only as to the negligent failure to warn issue. See also McIntyre v. Everest & Jennings, Inc., 575 F.2d 155 (8th Cir.), cert. denied, 439 U.S. 864, 99 S.Ct. 187, 58 L.Ed.2d 178 (1978) (district court had vacated award of punitive damages where verdict returned in strict liability, Missouri law). Moreover, although the strict liability claim was no longer before it, the Missouri Court of Appeals in Rinker specifically linked punitive damages to the defendant's conduct, giving as the purpose of punitive damages "to punish a defendant for an aggravated act of misconduct and to deter similar conduct in the future by the defendant and others." 567 S.W.2d at 668. This may indicate that Missouri is in the camp which would find punitive damages inconsistent with strict liability based on product defect because punitive damages look to the defendant's fault.
 
 
 [19]
 Plaintiffs have contended that several items of offered evidence were admissible to prove that, after the hitch in issue was sold by ACF to Union Pacific in 1959, ACF received information that caused it to be aware of a dangerous defect in the hitch. Such evidence was irrelevant on the strict liability failure to warn issue (see note 16 supra) of whether ACF sold the hitch without an adequate warning. In addition, the items were individually inadmissible for a variety of reasons, such as lack of foundation, confusion of issues, hearsay, or lack of identification