Joan PALMIERO, Plaintiff,

v.

**WESTON CONTROLS, A DIVISION OF FAIRCHILD WESTON SYSTEMS AND SCHLUMBERGER LTD., Defendant.**

No. 3: CV 88–1247.

United States District Court,
M.D. Pennsylvania.

Nov. 19, 1992.

Joseph T. Wright, Jr., McDonnell, O'Brien & Wright, Scranton, PA, for plaintiff.

Arthur L. Piccone, Hourigan, Kluger, Spohrer & Quinn, Wilkes Barre, PA, for defendant.

## MEMORANDUM AND ORDER

CONABOY, District Judge.

The Plaintiff began her employment at Defendant's plant in Archbald, Pennsylvania on April 13, 1956 and continued in that employment until her termination on November 11, 1986.

On August 12, 1988, the Plaintiff filed a three-count complaint against the Defendant, alleging causes of action pursuant to (1) the Age Discrimination and Employment Act; (2) Title VII of the Civil Rights Act, alleging sex discrimination; and (3) a pendent state tort claim alleging negligent misrepresentation. The Defendant filed an answer denying liability on February 13, 1989.

On August 20, 1991, the Plaintiff filed a Motion to Bifurcate the Title VII claim from the Age Discrimination and state tort claim actions. The Defendant opposed the bifurcation and eventually a stipulation was entered into that all issues would be tried to a jury.

After a considerable amount of discovery, the issues in the case were joined. Extensive settlement discussions ensued, but were futile and trial began on September 24, 1991. On September 30, 1991, the jury entered an award for the Plaintiff on all three counts, awarding her a total of $548,652.00.[1] Following the entry of judgment on the verdict, on October 10, 1991, the Defendant filed a Motion for Judgment Notwithstanding the Verdict or in the alternative a Motion for a New Trial. Thereafter, Defendant also filed a Motion for a

---

1. The verdict was apportioned as follows: for back pay $150,926.00; for front pay $196,800.00; for violations of the ADEA $150,926.00; and on the pendent state claim of negligent misrepresentation $50,000.00.

Remittitur.[2] Following allowance for time to receive the transcripts of the testimony in the case, the parties have fully briefed the motions.[3]

In the interim following the verdict award, the parties have engaged, with the assistance of the Court, in extensive settlement discussions. However, the Court was recently informed that these discussions have failed to develop an amicable resolution and, thus, we will dispose of the motions by this Opinion.

Because we find there was an abundance of evidence in the record on which the jury's verdict was based and because we find no errors in the trial meriting the grant of judgment N.O.V. or a new trial or a remittitur, we will deny the Defendant's motions.

## I

Because we must look at the facts of the case in a light most favorable to the verdict winner, and because we find the record supports the factual recitation submitted by the Plaintiff, we will adopt and repeat here the Plaintiff's factual submission as constituting the pertinent factual background submitted to and apparently believed by the jury.

On November 10, 1986, Plaintiff Joan Palmiero was terminated from her employment as a manufacturing supervisor for Weston Controls, a Division of Fairchild Weston, a subsidiary of Schlumberger, Ltd. (Vol. I, p. 62). Plaintiff was 54 years of age at the time of her termination and had been employed by the Defendant for in excess of 30 years. (Vol. I, p. 60). At all times during her employment up until the time of her termination, her work performance was satisfactory or better. (Vol. I, p. 43).

Defendants primarily performed assembly work at their Archbald facility working with various electronics, circuit boards or equipment. (Vol. I, p. 43). The assembly line that Plaintiff supervised for in excess of 25 years of her total employment of 31 years was known as the potentiometer line ("Pots"). (Vol. I, p. 60).

During the early 1980s, the parent company, Schlumberger, Ltd. made a decision to transfer the assembly line of potentiometer (both commercial and military) from their wholly owned subsidiary Fairchild Weston to another wholly owned subsidiary known as Sangamo Weston. (Vol. IV, p. 109). At the aforementioned time, a decision was made to establish a commercial line assembly of potentiometer in Juarez, Mexico. (Vol. IV, p. 109). Plaintiff, although remaining on the payroll at the Archbald facility, worked a considerable period of time at the Juarez facility between the years 1981 and 1984 as a supervisor on the potentiometer line. (Vol. III, p. 99). Upon successful establishment of the Juarez potentiometer line, Plaintiff was then requested by her Archbald employer to assist in the movement of the military potentiometer line from the Archbald facility to the Sangamo Weston facility in Pickens, South Carolina. (Vol. III, p. 101). Plaintiff remained at the Pickens, South Carolina facility as supervisor in 1986. (Vol. III, p. 112).

Upon her return to the Archbald facility in June, 1986, Plaintiff was assigned as a supervisor on the newly created Syossett line. (Vol. III, p. 114). At the time Plaintiff commenced employment on the Syossett line, there were three assemblers. (Vol. III, p. 115). Several months later, at the time of her termination in November of 1986, Plaintiff had increased the production on the line to a point where 25 employees were assigned as assemblers. (Vol. III, p. 117). Plaintiff's work performance on the Syossett line was satisfactory or better at all times. (Vol. III, p. 118). On November

---

**2.** Plaintiff's counsel has filed a motion seeking an award of counsel fees, which will be the subject of an additional Memorandum.

**3.** F.R.C.P. 50, as amended, effective December 1, 1991, has replaced the term JNOV with the term Judgment as a Matter of Law. The procedure for making such a motion and the standard of review remain unchanged. See FRCP 50– notes of advisory committee on 1991 Amendment, subdivisions (a), (b). Because the parties have used the old Titles, we continued that use in this opinion.

11, 1986, Plaintiff was called to the personnel office and was informed by the operations manager, Joe Kuenzig, as well as personnel director at the time, Gary McKinney, that Plaintiff's services with the company would no longer be needed. (Vol. III, p. 122). When Plaintiff inquired as to why she was being terminated, she was informed that her duties as a supervisor would be assumed by Harry Jenkins and Carl Martini, both of whom were not within the protected class. (Vol. III, p. 127). In the Answer to Plaintiff's Complaint, as well as during the course of depositions and other discovery, and also stated during trial, Defendants have advanced three reasons as to why Plaintiff was terminated rather than one of the other two male, younger employees (Martini and Jenkins). First, Defendants contend that a significant reduction of the work force was occurring at the Archbald facility in November, 1986. (Vol. I, p. 163). Secondly, Defendants contend that Martini and Jenkins had superior educational requirements which factored into the decision. (Vol. I, p. 164). Third, Defendants contend that Martini and Jenkins has superior technical skills to supervise the relevant assembly lines within the Archbald facility. (Vol. I, p. 164).

At the time of trial, Plaintiff, Joan Palmiero, testified to establish her prima facie case with respect to both the age and sex claims as well as the negligent misrepresentation claims. (Vol. I, p. 59–61). Plaintiff testified at the outset of the trial that on November 11, 1986, her job performance was satisfactory, that she was terminated and that she was replaced by two men who are not within the protected class, Jenkins and Martini. (Vol. I, p. 61). Additionally, Plaintiff presented testimony as to representations made by the former plant manager at the Archbald facility, Ray Sterling, as well as a former personnel director, Joe Owens, that Plaintiff would have a job available to her upon the completion of her duties in Juarez and Pickens and upon the elimination of the potentiometer line. (Vol. I, p. 162). Plaintiff also testified that she relied upon this representation in guiding her employment decision making process. (Vol. I, p. 62). Defendants then presented their testimony in an attempt to articulate a legitimate non-discriminatory reason for the termination. Defendants first called the plant manager at the time of Plaintiff's termination, Edward Moody. (Vol. I, p. 136). Moody testified that he has been employed at the facility since 1980. (Vol. I, p. 136). Mr. Moody testified that the two primary consideration given to the retention of the two younger male employees over the Plaintiff were job skills and education. (Vol. I, p. 164). Mr. Moody testified that no objective testing was performed to determine the relative job skills of the three individuals. (Vol. I, p. 100). Furthermore, upon cross examination, Mr. Moody was not able to articulate the particular skills which he believed Joan Palmiero lacked that the other two male individuals allegedly had possessed. (Vol. I, p. 186). Furthermore, Mr. Moody testified that he was not aware that Joan Palmiero had previously been certified to work on the IBM assembly line. (Vol. I, p. 191).

Mr. Moody further testified that the organization had to replenish their work force. (Vol. I, p. 203). Furthermore, he indicated that the organization kept statistics on the average age of the work force and that the organization would have to become lean and mean. (Vol. I, p. 203). Furthermore, in his subjective judgment, Harry Jenkins was a "young comer" within the organization. (Vol. I, p. 200). Mr. Moody testified that Jenkins was encouraged for his pursuing a college degree within the organization. However, Mr. Moody acknowledged that no job analysis was ever performed to relate a college degree with any of the supervisory or any other management position within the organization. (Vol. I, p. 204). Moody also acknowledged that Schlumberger, the parent company, was directing their subsidiaries to hire individuals who were "fresh out" of college. (Vol. I, p. 204).

Moreover, although Mr. Moody implied on direct examination that the company was going through a significant reduction in work force, the documented evidence in the EEO reports indicated that the size of the work force in the 1984 report was 836,

in the 1985 Report 879 and in the 1986 report 909. (Vol. I, p. 197). Also, Mr. Moody implied that the company was losing significant revenues during this period, the evidence in fact indicated that in 1980, the amount of revenues at the Archbald facility were $50,000,000 and in 1986 at the time of Joan's termination were up to $58,000,000. (Vol. I, p. 205).

Defendant next presented the testimony of the operations manager Joe Kuenzig by way of deposition in light of the fact that Mr. Kuenzig had passed away prior to the time of trial. Mr. Kuenzig testified that he had been employed at the Weston facility for only six months prior to Joan's termination. He testified that the IBM assembly line had been building the same components for years, that Mr. Jenkins assemblies were "not complex" and that Joan's work performance was well on the Syossett line. He further testified that he became aware that Archbald was to go through a reduction in force in April 1986 and that early retirement was a part of this reorganization. Furthermore, he testified that the company in considering the termination of Joan, was looking down the road for Jenkins and Martini.

Defendant next presented the testimony of William Ratchford who was manufacturing manager at the time of Joan's termination. (Vol. II, p. 117). William Ratchford testified that he had been an assembler on the potentiometer lines until 1978. (Vol. II, p. 113). He had no accredited schooling nor any technical training. (Vol. II, p. 113). In 1980, Mr. Ratchford went to Juarez, Mexico as a manufacturing manager of the potentiometer line. (Vol. II, p. 113). He testified that he, as well as Mr. Marra and other supervisors on the potentiometer line, had an agreement that there would be a job available for them upon their return to the Archbald facility. (Vol. II, p. 119). When Mr. Ratchford returned to the Archbald facility in 1985, he assumed the position as a manufacturing manager of the IBM line. (Vol. II, p. 119). Mr. Ratchford had no prior experience on the IBM line as Joan Palmiero had. (Vol. II, p. 119). Mr. Ratchford testified that when he returned to the Archbald facility

in 1986, his salary was $36,000. His salary at the time of his termination was $55,000. (Vol. II, p. 125).

Mr. Ratchford further testified that there were no job descriptions for any supervisors on the IBM line. (Vol. II, p. 126). Mr. Ratchford further testified that Joan would have had a problem on the IBM line but was not able to articulate the nature of the problem that she would have had on the line. (Vol. II, p. 131). Finally, Mr. Ratchford testified that he was not consulted regarding Joan's termination contrary to the testimony of Mr. Moody, Penzek and McKinney. (Vol. II, p. 125). Defendants next presented the testimony of John Laboranti who was the plant manager of the Juarez facility. (Vol. II, p. 154). Mr. Laboranti testified that he was a sheet metal mechanic in 1977 at the Archbald facility and was the plant manager of the Juarez facility through the year 1972. (Vol. II, p. 158). Mr. Laboranti indicated that the company wanted to develop his talents and that the company was grooming Mr. Laboranti for management positions. (Vol. II, p. 162). Upon his return from the Juarez facility, the parent company, Schlumberger, offered him a position with the parent organization. (Vol. II, p. 164). Also, Mr. Laboranti testified that Joan Palmiero's work performance at the Juarez facility was excellent. (Vol. II, p. 157).

Defendant next presented the testimony of Gary McKinney, the personnel director at the Archbald facility at the time of Plaintiff's termination. (Vol. II, p. 15). Mr. McKinney had testified that it was the policy of the parent company, Schlumberger, to transfer personnel directors from one subsidiary corporation to another every two years in order to implement the Schlumberger personnel policy. (Vol. II, p. 16). He further testified that the parent organization requested reports from the subsidiaries concerning statistics (age) in relation to the work force. (Vol. II, p. 17). With respect to any reduction in force, Mr. McKinney indicated that the personnel department did not perform an analysis to determine if a reduction in force would have an adverse impact on the protected

class, either age or sex. (Vol. III, p. 34). Furthermore, Mr. McKinney indicated that there was no skills analysis performed upon the work force, that skills were transferable among the various assembly lines, that there were no updated job descriptions, that the lions share of the business of Fairchild Weston was with the federal government in defense contracts and as a result the federal money mandated affirmative action. (Vol. III, p. 22–36). Furthermore, Mr. McKinney indicated that the EEO reports required that opportunities be developed for female employees and that the only affirmative action that he had given to Joan Palmiero was to "try to keep the facility in business". (Vol. III, p. 35).

Defendant's next witness was the personnel director at the time of trial, Barbara Chruschiel. Ms. Chruschiel testified that a review of Carl Martini's performance appraisals at the time of Joan's termination indicated that he had problem areas in adaptability and ability to work under pressure. (Vol. III, p. 61). Furthermore, she conceded that management had a plan for development for Carl Martini at the time of Joan's termination. (Vol. III, p. 63). Furthermore, she confirmed that the job descriptions for supervisors at the Archbald facility were outdated. (Vol. III, p. 64). Plaintiff then called Diane Bracey, a woman in her 20s, who testified that she was an assembler on Pots and rose to the level a supervisor on the IBM line without any special training in electronics. (Vol. III, p. 70–72). Joan Palmiero testified as to her employment history with the organization, her position as electrical assembler on the potentiometer line. (Vol. III, p. 85, etc.). She detailed the type and models of the various potentiometer for which she assembled. (Vol. III, p. 85, etc.). She rose from the position of an assembler to that of a group leader. (Vol. III, p. 86). In 1965, Joan was promoted to a supervisor on the potentiometer line. (Vol. III, p. 86). Furthermore, during that time she worked on the IBM line for approximately one and one-half years. (Vol. III, p. 86). Joan testified that in 1980 she went to Juarez, Mexico as a supervisor. (Vol. III, p. 92). She further testified that she was sur-

prised and disappointed that Mr. Ratchford was going to Juarez as a manager and she was not considered for the position. (Vol. VII, p. 93). She testified that she had learned Spanish in order to assist the Mexican assemblers in the production of the potentiometer. (Vol. III, p. 95). Further, she testified that in 1984, while on assignment in Juarez, she learned through Mr. Ratchford that the military end of all the potentiometer was going to be moved to Pickens, South Carolina. (Vol. III, p. 102).

Plaintiff next called an economist, Dr. Harriet Zellner, to project Plaintiff's loss of earning but for the discriminatory termination. (Vol. IV, p. 20, etc.). Dr. Zellner projected Plaintiff's earning streams but for the termination, from the date of termination to the date of trial and from the date of trial to age 65. (Vol. IV, p. 32). The economist then factored in a downward adjustment of the stream to reflect present value. (Vol. IV, p. 40). The economist also calculated a downward reduction taking in the possibility that Plaintiff might leave the labor force prior to age 65 and also might pass away prior to age 65. (Vol. IV, p. 41). The economist testified that her opinions were extremely conservative because of the mortality probabilities and the labor force withdrawal probabilities. (Vol. IV, p. 42). The economist also projected an earning stream that Plaintiff will receive from her new employer, Gentex, to age 65. (Vol. IV, p. 42). Plaintiff's economist calculated Plaintiff's conservative back pay award to be in the amount of $150,926. (Vol. IV, p. 40). The front pay award was calculated in the amount of $196,800. (Vol. IV, p. 64).

Plaintiff then called as a final witness, Joseph Owen, the personnel director at the Archbald facility during the year 1984. Owen testified that he was 38 at the time of Joan's termination. (Vol. IV, p. 107). He also testified that in the year 1984, in addition to announcing the phasing out of the potentiometer line, a new company policy was implemented regarding early retirement known as "the rule of 85". (Vol. IV, p. 112). Also, during the same time period, Schlumberger had a practice of hiring individuals into the organization that were

"fresh out" of college. (Vol. IV, p. 112). Finally, Mr. Owens testified that the job description regarding the IBM line had not changed in over 20 years. (Vol. IV, p. 125). Upon a return of verdict, the jury found that age was a determining factor in the Defendant's decision to terminate Plaintiff's employment. Furthermore, the jury found that the Defendant wilfully discriminated against the Plaintiff on the basis of her age. Further, the jury found that sex made a difference in Plaintiff's promotion but not in her termination or salary. The jury then awarded back pay in the amount of $150,926, front pay in the amount of $196,800 and liquidated damages in the amount of $150,926. Finally, the jury found that the Defendant negligently misrepresented that Plaintiff would remain employed at the Archbald facility upon completion of her duties in Juarez, Mexico and Pickens, South Carolina and awarded her $50,000 in damages for this negligent misrepresentation.

The Defendant's position against the Plaintiff's claim is succinctly set forth in Defendant's brief, page 6, as follows:

It is Weston Controls contention that the termination of the Plaintiff was motivated by sound business judgment. The Plaintiff's sex and/or age had no effect whatsoever on the Defendant's decision to termination the Plaintiff. As the weight of evidence showed at trial, not only was the Plaintiff terminated due to the economic realignment of the Archbald plant, but also due to the Plaintiff's lack of transferable skills needed for a supervisory position on the IBM line. Moreover, the Plaintiff refused a good faith offer of employment at the Pickens facility, where her supervisory skills on the potentiometer line made employment possible. Of course, the Plaintiff did not have a promise of lifetime employment. As a result, Weston Controls maintains that no damages were proper in the instant case.

The jury obviously rejected the Defendant's contentions and found the credible evidence merited a verdict in her favor.

At the close of the testimony in this case the Defendant filed a Motion for Directed Verdict and at that time based the motion on two arguments: (1) that the Plaintiff failed to establish a prima facie case; and (2) that the totality of the evidence failed to show that a discriminatory reason motivated the employer's conduct with respect to age or sex in the Plaintiff's termination. The motion was denied. In pressing the post-trial motions, the Defendant attempts to expand considerably on these items preserved at trial.

## II

The parties make similar references and generally agree on the procedural guidelines to be followed in considering the motions in this case.

Rule 50 of the Federal Rules of Civil Procedure provides in pertinent part as follows:

(a) Motion for Directed Verdicts: When made; effect ... a Motion for Directed Verdict shall state the specific grounds therefor.

(b) Motion for Judgment Notwithstanding the Verdict. Whenever a Motion for Directed Verdict made at the close of all the evidence is denied or for any reason is not granted, the court is deemed to have submitted the action to the jury subject to a later determination of the legal questions raised by the motion.

A party who has properly moved for a directed verdict, may move to have the verdict and any judgment entered thereon set aside, and to have judgment entered in accordance with that party's Motion for a Directed Verdict. A Motion for a New Trial may be joined with this motion, or a new trial may be prayed for in the alternative. If a verdict was returned, the Court may allow the judgment to stand or may reopen the judgment and either order a new trial of direct the entry of judgment as if the requested verdict had been directed. Thus, a Motion for Judgment Notwithstanding the Verdict may be granted even though the Motion for a Directed Verdict was originally denied.

In *Kutner Buick, Inc. v. American Motors Corporation*, 868 F.2d 614 (3d Cir. 1989), the Court held "the rule that a post-trial Rule 50 motion can only be made on grounds specifically advanced in a Motion for a Directed Verdict at the end of the Plaintiff's case, is the settled law of this Circuit."

In reviewing a motion pursuant to Rule 50, the Court must view the evidence in a light most favorable to the party against whom the motion is made and a directed verdict or judgment N.O.V. is appropriate only when the facts and the inferences viewed most favorably to the non moving party, points so strongly in favor of one party that reasonable minds could not come to different conclusions. *Saye v. St. Vrain Valley School District*, 785 F.2d 862 (10th Cir.1986); and *Dancey Company, Inc. v. Borg–Warner Corp.*, 799 F.2d 717 (11th Cir.1986).

The Defendant's argument seeking judgment N.O.V. addresses three areas: (1) "administrative procedural errors"; (2) "trial procedural errors"; and (3) "burden of proof". We will address each of these.

### (1) Administrative Procedural Errors

■ Defendant argues that there are certain general procedural prerequisites to the maintenance of an action in the Federal Courts pursuant to the provisions of Title VII. The Defendant thereafter talks about the timely filing of employment discrimination charges with the EEOC [citing 42 U.S.C. § 2000e–5(e)] and the receipt of a right to sue letter from the EEOC, along with the institution of suit within the time periods mandated by the various sections of the same statute.

Plaintiff, however, properly points out that these matters were not raised by the Defendant at the time the Motions for Directed Verdict were made and, thus, raising it at this time is untimely. We agree with the Plaintiff's argument and find that the failure to raise this argument at an appropriate time results in the Defendant's waiving its right to raise the argument for the first time on a post verdict judgment N.O.V. motion.

### (2) Trial Procedural Errors

■ The Defendant argues that "Title VII, as in effect at the time of the September Trial, did not provide for a jury trial." Here, Defendant argues that the jury should not have heard evidence unique to alleged sex discrimination in termination, salary or promotion because Title VII does not provide for a jury trial.

It is not uncommon to have matters that are normally non-jury and jury considerations mixed in the same litigation. A variety of methods have been devised to resolve this dilemma, including agreements by the parties to have all the issues heard either by a jury or by the Court without a jury. In this case, as previously pointed out, the Plaintiff formally requested a bifurcation of the jury and the non-jury issues and the Defendant strongly opposed that motion. In discussion with counsel for both parties, the problem was resolved by a stipulation of all parties approved by the Court to try the entire matter to the jury. We find no error in this procedure, and thus, no merit in this argument of the Defendant.

### (3) Burden of Proof

■ The Defendant argues that the Plaintiff failed to sustain her burden of proof by producing sufficient evidence from which the jury could find that she has proved her claim of sex and age discrimination by the fair weight and preponderance of the evidence.

In pressing this argument the Defendant argues that the Plaintiff failed to produce any direct evidence that she was terminated because of her age or sex or that she was denied a promotion because of her age or sex. The Defendant goes on to argue that "in the absence of direct evidence that age and/or sex was a factor, in any employment decisions concerning the Plaintiff, she undertook to present a prima facie case and prove pretext and, ultimately unlawful discrimination based upon the general circumstances under which she was discharged in 1986 and denied a promotion in 1981."

It bears repeating here that, in considering a Motion for Judgment N.O.V., the Court does not exercise any discretion nor does it attempt to preempt the jury's duty, but makes only rulings of law in determining whether there was any evidence upon which the jury could make appropriate findings. *See Dawson v. Chrysler Corp.*, 630 F.2d 950 (3d Cir.1980).

On the legal issue concerning the Plaintiff's burden of proof, the parties agree that the law generally provides that the Plaintiff, in order to make out a prima facie case, must establish:

(1) that she was a member of protected class;

(2) that she was discharged;

(3) that she was qualified for the position held; and

(4) that she was replaced by an individual outside of the protected class.

*See McDonnell Douglas v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973).

In *McDonnell*, too, and a number of cases following, the parties agree it was established that the Plaintiff must first make out a prima facie case of discrimination and if she succeeds in doing that, the duty of going forward shifts to the Defendant to articulate some legitimate nondiscriminatory reason or reasons for any adverse employment decision. Once the Defendant has assumed that burden, the responsibility shifts back to the Plaintiff to negate the Defendant's alleged nondiscriminatory reasons by showing that the stated reasons were not true, but merely pretextual and that the true reason was unlawful sexual or age discrimination.

The Defendant acknowledges that the Plaintiff was a member of a protected class in both the sex and age discrimination facets of her case and additionally acknowledges that the Plaintiff was, in fact, discharged.

Defendant goes on to argue, however, that the Plaintiff failed to establish that she could perform work at the Archbald plant or that she was qualified to perform work that remained after some of its business decisions were made concerning the Archbald plant. In this vein, the Defendant also argues that the Plaintiff didn't sustain her burden of identifying positions upon which an award of damages could be based. Further the Defendant argues that since certain work was terminated at the Archbald plant, there was in fact no work remaining for the Plaintiff to perform for which she was either eligible or qualified.

The Defendant also would confine consideration of the evidence to two instances: one, in 1981 when the Plaintiff was denied a promotion and, second, in 1986 when the Plaintiff was terminated because, the Defendant argues, there was no remaining work in the Archbald plant for which she was qualified. The weakness of these arguments is born out of a determination to turn a deaf ear to the totality of the evidence submitted to the jury from the mouths of not only Plaintiff's but also Defendant's witnesses. We have gone to substantial length to quote the believable evidence in the initial part of this opinion. Suffice is to say, there was substantial evidence which the jury obviously believed to justify their conclusions that both sex and age were determinative factors in decisions regarding her promotions and positions during her time with the Defendant company, as well as her ultimate termination by the Defendant.

While the Defendant argues there were no jobs remaining for which the Plaintiff was qualified at the time of her termination, the testimony belies that argument and there is substantial evidence in the record indicating that the Plaintiff was a highly qualified and valued employee, capable of performing almost any job on any of the lines in the Defendant's plant. Indeed, she was widely used to instruct and to guide other employees over a period of many years and there was never a time when her work was considered less than highly satisfactory.

Under the circumstances, it would be an intrusion of this Court into the jury's province, which is not allowed by law, to grant the Defendant's motion, and we decline to do so.

## III

## MOTION FOR NEW TRIAL

Both parties agree that the standard which a movant is held to concerning a Motion for New Trial is less onerous than the standard for granting of Judgment Notwithstanding the Verdict. The law provides that a trial judge should grant a new trial if the verdict is against the weight of the evidence, damages are excessive, or for other reasons the trial was not fair, or because substantial errors occurred in admission or rejection of evidence, or the giving or refusal to give instructions. See *Bhaya v. Westinghouse Electric Corp.*, 832 F.2d 258 (3d Cir.1987); *Roebuck v. Drexel University*, 852 F.2d 715 (3d Cir. 1988); *EEOC v. Delaware Dept. of Health and Social Services*, 865 F.2d 1408 (3d Cir.1989); *Bruno v. W.B. Saunders Co. et al.*, 882 F.2d 760 (3d Cir.1989).

Plaintiff points out and we agree, that a new trial should not be granted on grounds not called to Court's attention during the trial, unless the error was so fundamental that gross injustice would result. (see *Ward v. City of San Jose*, 737 F.Supp. 1502 (N.D.Cal.1990)).

It is somewhat difficult to address the reasons the Defendant asserts for a new trial in an orderly fashion. First, there are some 50 plus paragraphs contained in the original and supplemental motions. Secondly, many of the paragraphs constitute repetition and argument and, third, much of what is raised in these post-trial motions was never raised prior to the trial, during the trial or at the conclusion of the trial. Nonetheless, the new trial motion appears to be broken into four general categories: (1) damages; (2) court trial errors; (3) misconduct of counsel in argument; and (4) improper submission to the jury. We will, therefore, address these various areas.

### (1) Damages

■ The Defendant makes a variety of arguments concerning the damages, i.e. that the damages are generally excessive; that the jury was somehow improperly inflamed by the allowance of testimony concerning sex discrimination in a jury trial; that the Plaintiff had been offered alternative employment and refused it; and that there was no "empirical evidence" that the Plaintiff would work to age 65. And finally, that there was no evidence of wilfulness which would allow for an award of liquidated damages.

While the parties and, particularly, the Defendant cite a large number of cases concerning to the various arguments, the law and procedures in discrimination cases have been rather singularly defined by the United States Supreme Court and adopted in this circuit. All of the parties understood that we were following that line of legal reasoning and procedure and the case was submitted to the jury in accordance with those principles. We referred above to the *McDonnell Douglas* case and we repeat here again the guidelines first enunciated in that case and ever since followed with some refinements in this circuit.

In allocating the burdens of proof in an ADEA suit alleging disparate-treatment on the basis of circumstantial evidence, we follow the formula enunciated in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), and *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981), for cases brought under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq. (1982). See *Chipollini v. Spencer Gifts, Inc.*, 814 F.2d 893, 897 (3d Cir.) (in banc), cert. dismissed, 483 U.S. 1052, 108 S.Ct. 26, 97 L.Ed.2d 815 (1987). Under that formula,

[f]irst, the plaintiff has the burden of proving by a preponderance of the evidence a prima facie case of discrimination. Second, if the plaintiff succeeds in proving the prima facie case, the burden shifts to the defendant "to articulate some legitimate, nondiscriminatory reason for the employee's rejection." ... Third, should the defendant carry this burden, the plaintiff must then have an opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the de-

fendant were not its true reasons, but were a pretext for discrimination. *Burdine,* 450 U.S. at 252–53, 101 S.Ct. at 1093 (citations omitted).

The opportunity, and thus the ultimate burden, either to prove that a discriminatory reason more likely than not motivated the employer's conduct, or to show that the employer's proffered explanation is unworthy of credence, lies with the plaintiff. While recent Supreme Court jurisprudence in the area of employment discrimination has been cast on the *McDonnell Douglas/Burdine* allocation of burdens. See *Price Waterhouse v. Hopkins,* 490 U.S. 228, 244, 109 S.Ct. 1775, 1788, 104 L.Ed.2d 268 (1989) (in a disparate-treatment suit, where an employer uses both legitimate and illegitimate criteria, "the plaintiff retains the burden of persuasion of the issue [of] whether gender played a part in the employment decision"); *Wards Cove Packing Co., Inc. v. Atonio,* 490 U.S. 642, 659, 109 S.Ct. 2115, 2126, 104 L.Ed.2d 733 (1989) (where an employer meets the burden of producing evidence of a business justification in a disparate-impact case, the persuasion burden remains with the plaintiff to disprove the purported rationale); *Patterson v. McLean Credit Union,* 491 U.S. 164, 186, 109 S.Ct. 2363, 2378, 105 L.Ed.2d 132 (1989) (where an employer proffers a legitimate nondiscriminatory reason for its conduct in an action brought under 42 U.S.C. § 1981, the plaintiff "retains the final burden of persuading the jury to intentional discrimination").

See *Bartek v. Urban Redevelopment Auth. of Pittsburgh,* 882 F.2d 739 (3d Cir. 1989).

We cite again from *Bartek,* supra. for guidance concerning the concept of wilfulness.

Keeping with the rationale of Thurston, we therefore concluded that, in cases involved an employer's conduct against an individual employee, a finding of a willful violation of the ADEA had to be supported by evidence of outrageous conduct that was not merely duplicative of that evidence needed for awarding compensatory damages. *Dreyer* [*v. Arco Chemical*], 801 F.2d [651] at 658 [3d Cir.1986]. We noted that liquidated damages might be justified where there is evidence of an employer's (1) systematic purging of older employees, (2) discharging an employee at a time that would deny her or him an imminent pension, or (3) previous violation of the ADEA. We noted, however, that no paradigm of conduct warranting liquidated damages existed, and that "the appropriateness of the award will be dependent upon an ad hoc inquiry into the particular circumstances."

We cannot give much weight, nor perhaps should we even consider, the Defendant's argument about allowing testimony regarding sex discrimination in the course of this jury trial. As we have said a number of times, that procedure was agreed upon by all of the parties and no objection was raised prior to, during, or immediately after the trial by the Defendant. Indeed, just the opposite is true, since the Defendant strongly objected to any bifurcation of the issues in this trial. The Plaintiff was obviously a woman and her testimony and that of her witnesses was designed to show that her sex and age were issues that affected her employment with the Defendant over a long period of time and ultimately resulted in her improper termination. These issues were intertwined and to suggest that the testimony regarding sex discrimination somehow improperly inflamed the jury, simply has no merit.

We note here, too, that it almost appears that the Defendant has turned a deaf ear and a blind eye toward the testimony favorable to the Plaintiff presented during the trial and reflected in the trial transcript. This happens sometimes in an enthusiastic representation of one's client, but the jury and likewise, the Court have the obligation of listening to and reviewing all of the testimony, and indeed, in the position in which we consider this case at the present time, we must review it all in a light most favorable to the Plaintiff (verdict winner).

There was testimony, for instance, about "alternative employment" being offered to the Plaintiff. However, the Plaintiff validly explained her reaction to alternative employment, both at the time of her termination and in the course of her prior duties with the Defendant. The Plaintiff also validly explained that there was work available for which she was qualified at the plant in Archbald and, indeed, that such work remained available throughout out the time of the trial of this case. It is true that the Defendant argues that it did not have work for which the Plaintiff was qualified, but the jury simply chose not to believe that testimony and believed that the Plaintiff was qualified for many jobs remaining in the Defendant's plan up to and including the time of trial and to which younger male persons had been assigned.

There was ample evidence on which a jury could find that the Plaintiff intended to and was able to continue her employment through age 65, including the Plaintiff's own testimony and her record of continuous satisfactory employment. The jury was instructed that it could consider all of the normal elements in a person's lifetime in determining whether or not they felt the Plaintiff would in fact work through to age 65. In addition, the jury was instructed that in computing damages into the future they could consider all of the normal elements that affect one's life and one's ability to work in determining how long the Plaintiff would probably have worked and how long work would probably have been available for her.

■ The Defendant is correct in citing *Dreyer v. Arco Chemical*, 801 F.2d 651 (3d Cir.1986), *cert. denied*, 480 U.S. 906, 107 S.Ct. 1348, 94 L.Ed.2d 519 (1987), as initially setting for the standard for determining wilfulness in cases of employment discrimination.

Indeed, we have heretofore quoted from *Bartek*, supra, setting forth the guidelines for determining whether or not there is sufficient evidence upon which a grant of liquidated damages may be awarded for wilful misconduct. We are compelled to note here again that this issue was never raised during the course or at the conclusion of the trial. Nonetheless, we point out that we are in agreement with the Plaintiff's argument made in its brief as follows:

> Moreover, Plaintiff did produce additional evidence of outrageous conduct by way of the testimony of Martini and Jenkins being young comers by lack of any objective evidence to support that Plaintiff lacked technical skills to assume the job, by Defendant's attempt to have Plaintiff sign a release at the time of her termination, because of the fact that the jury did not believe that the employer had any reasonable grounds for not being in violation of the ADEA, because all reasons offered by Defendant at time of trial were completely incredulous, that after the elimination of the potentiometer line, all remaining supervisors on the IBM, GAUGE and SYOSSETT lines were at an age range in their 20s and 30s, that Defendant terminated Plaintiff at 54, wherein she was one year shy of being eligible for the Rule 85 retirement benefits.

That argument correctly, in the Court's opinion, summarizes much of the testimony which goes to the issue of wilful conduct of the Defendant. The jury, in considering the overall testimony favorable to the Plaintiff in this case, could have reasonably concluded that this Plaintiff, a loyal, long-time employee, was unfairly treated over a long period of time regarding promotions, job assignments, and efforts to terminate her prior to her eligibility for retirement benefits, when in fact, she was a person capable and qualified to do most jobs in the Defendant's plant and had been relied on over a period of years to teach and instruct and to guide others, many of whom were of the opposite sex and much younger than she.

All of this considered requires the Court to conclude there was sufficient evidence of wilfulness on the part of the Defendant to have this matter submitted to the jury and on which the jury properly made its determination.

*(2) Trial Errors*

■ Next we address the Defendant's argument concerning trial court errors. Here, Defendant argues that the Court permitted the Plaintiff to introduce a claim, "which was not disclosed at the pretrial conference or in the pleadings" and that the Plaintiff was allowed to testify about certain promotions which evidence the Defendant claims was irrelevant to the Plaintiff's claim, finally, that the Court erred in failing to require the Plaintiff "to establish her prima facie case that she was competent for the job and possessed at least minimum qualifications to work".

We have already addressed some of these issues, pointing out that there was extensive testimony about the Plaintiff's qualifications. Indeed, the record reflects that the Plaintiff was a valued employee who was used not only in the local Archbald plant but was sent to other plants where the Defendant was setting up new installations and the Plaintiff was used to train and direct new employees in work very similar to that which she was doing and obviously capable of doing at the Archbald plant. To suggest that there was a lack of testimony about her qualifications or that there was any serious attack on her qualifications is patently contradictory of the record.

The Plaintiff, among other things, had the burden of proving wilfulness in this case, and thus, the Defendant's conduct regarding promotions and general behavior toward the Plaintiff was all very important and needed testimony in this case. Had she not been able to produce such testimony, the Defendant, indeed, would be in a much stronger position to argue a lack of proof of wilfulness. The same rationale applies to the Plaintiff's testimony about other promotions and work which the Defendant argues took place after the Plaintiff's termination. Once again we need point out that the Plaintiff had the obligation of proving the continuation of available work for which she was qualified, as well as the determined and wilful effort of the Defendant to replace her by others of the opposite sex and lesser age.

*(3) Misconduct of Counsel*

■ On the issue of alleged "misconduct of counsel in argument" we agree with Defendant that prejudicial misconduct of counsel in argument or during the trial may necessitate a trial if it is so egregious as to mislead or prejudice the jury or if it so repetitious and offensive that its inappropriate effect is obvious.

In determining whether a new trial should be granted on the basis of alleged improper remarks in closing arguments by counsel, the Court should consider whether those remarks resulted in a verdict that was rendered because of mistake, passion, prejudice or other improper motive brought about by the alleged improper remarks.

Early in this trial, when there was some argument about inappropriate remarks to the jury, the Court cautioned both counsel to confine their remarks to issues about which there was or would be testimony and evidence in the case. Even acknowledging that there was some reference to the size of the Defendant company and its international status, we find that the remarks were fleeting and not made in a vein which would raise or inflame any prejudice or other improper motive in the minds of the jurors. There was ample, appropriate testimony, in the record, for instance, about the fact that the Defendant had operations not only in Pennsylvania, but in other locations in the United States, as well as operations in Mexico and elsewhere. Under such circumstances, the jury was well aware of the international status of the company, in spite of any remarks by counsel.

The case of *Vanskike v. ACF Industries, Inc.*, 665 F.2d 188 (8th Cir.1981), cert. denied, 455 U.S. 1000, 102 S.Ct. 1632, 71 L.Ed.2d 867 (1982), is a good example against which to test whether or not counsel's argument is inflammatory. The *Vanskike* case involved an injured railroad employee who brought suit against the manufacturer of a trailer hitch device and the railroad which owned the device on the theory of products liability and negligence.

In the course of his closing argument, counsel for the Plaintiff, among other

things, referred the jury to a case against the Company, arguing that the jury in that case acted as the conscience of the American public in entering a large verdict against the Ford Motor Company. In addition, counsel also made mathematical computations, on matters that were not of record, about how many persons could be "maimed by a model A hitch" if every railroad in the country was responsible for one injury. None of this was of record in the case, and the reference to the Ford Motor Company matter involved a case in California that had received extensive press and television coverage throughout the United States shortly before the *Vanskike* trial. The Court, among other things, in *Vanskike*, found it was improper for counsel to suggest to the jury that it should follow the example in the Ford Motor Company case and enter a verdict which would essentially punish the Defendant for improper conduct.

When we compare the arguments of counsel in this case, we find no similarity to the type of conduct which occurred in the *Vanskike* case. Here, there was no dwelling on matters which were not of record and there was no call by counsel to have this jury do something comparative to what was done in any other case.

In addition, the Court instructed the jury on a number of occasions that statements of counsel were not evidence and should not be looked upon by the jury as evidence and that the jury had the obligation of reaching its decision solely and totally on the evidence which was presented and the testimony of the witnesses who appeared in this case.

Under all of the circumstances of this trial, therefore, we find no merit in the argument that Plaintiff counsel's argument was so inappropriate as to prejudice the jury or to cause it to render its verdict based on anything other than the testimony and evidence in the case.

#### (4) Improper Submissions to Jury

■ In the final section of the Defendant's argument, the Defendant refers to certain "improper submissions" to the jury.

Here, the Defendant argues that the Court did not give proper instructions on the burden of the Plaintiff in showing that the Defendant's proffered reasons for termination were a mere pretext for discrimination based upon age or sex; that the Court failed to properly instruct the jury on the issue of wilfulness and the need for additional evidence of outrageous conduct in this regard; that the jury should not have been permitted to hear evidence "unique to alleged sexual discrimination, because Title VII does not provide for jury trial"; that the Court erred in allowing the Plaintiff to recover back wages when it was "established at trial that the IBM job which the Plaintiff claims she was entitled to only remained in operation for two years after her termination"; and that the Court erred by allowing the Plaintiff to recover damages in the amount of $50,000.00 for negligent misrepresentation, when she had already recovered damages for back pay. We have covered substantially all of the arguments made by counsel for both Plaintiff and Defendant on the issue of damages in an earlier part of this Memorandum and will not repeat that here, except to say that we find no merit in the Defendant's argument regarding the damages recovered by the Plaintiff. We have likewise covered the issue of allowing testimony concerning sex, as well as age discrimination because of the stipulation to try this case to a jury and will not repeat that again. In addition, we have also covered the issue of wilfulness to the effect that we find no merit in this argument presented by the Defendant.

On the issue of the Plaintiff's recovery of $50,000.00 in damages for negligent representation, as well as her recovery of damages for back pay, we point out that this matter was not raised in the course of the trial, nor was any objection to the testimony about these items made in the course of the trial. In addition, we point out that the Defendant cites no authority for this argument, other than the gratuitous assertion that to allow the Plaintiff to retain this portion of the damage award by the jury would "allow the Plaintiff to receive a windfall recovery since both theories are

fully capable of compensating the Plaintiff for any alleged damage she may have incurred as a result of her termination."

We find no merit in these arguments of the Defendant concerning alleged trial errors or "improper submissions to the jury" and find further, that taken separately or cumulatively, they do not amount to an argument which would entitle the Defendant to a new trial.

## IV

██ Finally, on the issue of remittitur, we find that the Defendant makes arguments similar to those previously advanced generally about the verdict in this case. That is, the damages were in excess of what a proper functioning jury should have awarded; that the verdict was the result of passion or prejudice; that the verdict was excessive and contrary to the weight of the evidence; that it was established at trial that the Plaintiff "would have been employed by the Defendant subsequent to the Fall of 1988, when the IBM line was shut down"; and finally, that the Defendant is "entitled to a remittitur of the entire award for wrongful discharge".

A review of this opinion will show that we have addressed each of these items as they were raised in the general context of the Motion for Judgment N.O.V. and the Motion for New Trial. We found no merit in the arguments as they were made concerning those motions and we likewise find that the arguments do not amount to a justification for any remittitur in this case and, thus, that motion will also be denied.